**UNITED STATES of America**

v.

**Kenneth L. WILLIAMS, et al.**

**Criminal Action No. 3:07CR–117–S.**

United States District Court,
W.D. Kentucky.

Aug. 20, 2009.

Ann Claire Phillips, U.S. Attorney Office, Louisville, KY, for United State of America.

Laura R. Wyrosdick, Western Kentucky Federal Community Defender, Inc., Louisville, KY, for Kenneth L. Williams.

### MEMORANDUM OPINION AND ORDER

CHARLES R. SIMPSON, III, District Judge.

This matter is before the court for consideration of the objections of various defendants to the Findings of Fact, Conclusions of Law, and Recommendations of the United States Magistrate Judge concerning the disposition of five motions to suppress evidence (DNs 64, 109, 110, 203, 215). The magistrate judge conducted an evidentiary hearing on February 9, 2009. After post-hearing briefing, the magistrate judge filed a sixty-four page report recommending the following action:

1. That the court suppress evidence seized from the home of defendant Kenneth L. Williams at 9938 Apollo Court and from the gold Suburban automobile located there.

2. That the court suppress from evidence the storage unit rental receipt taken from Kenneth L. Williams' Lincoln Town Car and copied by law enforcement officers.

3. That the court suppress evidence seized from the person of Michael Ford at the time of the vehicle stop on January 15, 2006.

4. That the remaining requests for suppression of evidence be denied.

There was no objection to the recommendation that the court suppress evidence seized from 9938 Apollo Court and from the gold Suburban automobile. Therefore, the magistrate's findings and recommendation will be accepted and adopted on this point.

Similarly, no objection has been raised to suppression of the storage unit rental receipt. The magistrate's ruling will be accepted and adopted, and this item will be suppressed.

The court finds that the objection of the United States to the recommended suppression of evidence seized from the person of Michael Ford is well taken. The magistrate judge stated at p. 61 of his report that "... [i]f the evidence taken from Michael Ford's person and automobile is to be admitted, its seizure must rest upon some other ground than Ford's alleged consent." However, the evidence of record establishes that Ford consented to the search of his person. Unlike the evidence with respect to the search of Ford's vehicle which the magistrate judge characterized as a "he said/he said" situation, the only evidence concerning the search of Michael Ford's person is the testimony of Sgt. Butler that Ford gave consent. Ford testified at the hearing, but was asked only if he consented to the search of the vehicle. Thus the evidence offered by the United States with respect to the consent to search Ford's person stands unrefuted.

The United States must establish by a preponderance of the evidence that Ford validly consented. *Morphis v. United States*, 110 Fed.Appx. 527 (6th Cir. 2004)("An individual may consent to a search of his person, premises, or effects; and such consent to search is valid if it is voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).). Although the magistrate judge commented that "the record contains little in the way of factual detail," Magistrate's Report, p. 60, he concludes only that "the Court cannot meaningfully determine whether Defendant Ford voluntarily and intelligently consented to the search of his vehicle," finding a "he said/he said" situation with diametrically opposed

testimony of Sgt. Butler and Michael Ford as to the vehicle search. The magistrate inaccurately found, however, that Michael Ford testified that he did not consent. Magistrate's Report, p. 63; *But see*, Tr. of Evid. Hrg., p. 221. Beginning from this erroneous premise, the magistrate judge concluded that there was no valid basis for the search of Ford's person and that the evidence should be suppressed.

In determining whether consent was voluntarily given, the court must examine the totality of the circumstances. *Schneckloth, supra.* Neither Ford nor any of the co-defendants who were passengers in his vehicle provided evidence contrary to that of Sgt. Butler. In the absence of any basis to doubt the testimony of Sgt. Butler on this point, the court will find that Ford consented to the search of his person. Therefore, the evidence seized from his person will not be suppressed.

The additional objections of the defendants are without merit.

Kenneth L. Williams objects that the magistrate judge precluded him from eliciting testimony outside the four corners of the search warrant and affidavit. He does not elaborate on this general objection. There is therefore nothing for the court to address herein.

Williams objects that the magistrate judge assumed facts regarding the inevitable discovery doctrine. We find no error. An ongoing investigation into the activities of Kenneth L. Williams led to the search warrant to place the tracking device in his vehicle. Had the vehicle not been towed on December 21, 2005, the device would have been placed on the vehicle in any event. No error has been shown in the magistrate judge's finding of sufficiency of the search warrant affidavit. Williams was under surveillance and he was observed frequenting the storage unit around the time of the commission of various crimes with which he was suspected to be involved. Despite the suppression of the storage unit rental receipt, the mechanism for inevitable discovery of the evidence in question was clearly in motion. The scenario of inevitable discovery was grounded in facts found by the magistrate judge. Williams contends that, in light of the suppression of the evidence seized from his residence and vehicle, further suppression of evidence is warranted as fruit of the poisonous tree. However, in light of the surveillance establishing Williams' multiple trips to the storage unit,[1] the doctrine of inevitable discovery was properly applied by the magistrate judge.

The objections of Christopher Allen Kittrell to the magistrate's report warrant little discussion. The magistrate judge concluded that, as to any items seized from his person or any post-arrest statements he may have made,

> "Kittrell was taken into custody immediately following the stop of his vehicle and was arrested based on various traffic offenses witnessed by the police as they followed him that evening. He therefor was subject to the search incident to arrest doctrine as recently redefined in *Arizona v. Gant*, —— U.S. ——,

---

1. Williams objects to the magistrate judge's finding that he concluded that surveillance "confirmed Williams' visit to the storage unit prior to and directly after committing the credit card and ID thefts in the Louisville area that December." Magistrate's Report, p. 48, noting that Williams stands accused, but presumed innocent of any crime. We note that this is not the magistrate judge's own conclusion, but rather taken from the affirmative statements contained in the affidavit for the search warrant for the storage unit. The United States must, of course, prove Williams guilty beyond a reasonable doubt as to any crime of which he stands accused. The ruling on suppression issues does not suggest anything to the contrary.

129 S.Ct. 1710 [173 L.Ed.2d 485] (2009). The interior of his vehicle was separately subject to search under the automobile exception discussed above."

Magistrate's Report, p. 63. Kittrell was stopped and arrested on various traffic violations. As noted by the United States, the fact that he and his vehicle was under surveillance for suspected criminal activity does not render the stop impermissible. *United States v. Blair,* 524 F.3d 740, 748 (6th Cir.2008). Further, the investigating officers were investigating an alleged credit card theft and fraud conspiracy of which Kittrell was allegedly a member. The criminal conduct was said to have been ongoing over a period of time. Kittrell was suspected of participating in thefts on the day he was stopped on the return trip from Indianapolis. Kittrell and others were observed engaging in the precise pattern of activity which the informant described as the method by which thefts were conducted. Kittrell need not have been shown to have engaged in particular criminal acts on occasions prior to the day in question if he was shown to have associated himself with the alleged co-conspirators and was engaged in suspected criminal activity prior to the stop. *United States v. Hughes,* 895 F.2d 1135, 1141 (6th Cir.1990)(defendants involved in single criminal venture with more than one phase of criminal activity). When Kittrell's vehicle was stopped and he was arrested, there was a fair probability that contraband or evidence of a crime would be found in his vehicle. Therefore, the magistrate judge correctly applied the automobile exception in recommending that we uphold the warrantless search of Kittrell's vehicle.

 Michael Ford objects to the warrantless search of the trunk of his vehicle after he was stopped on his return from Indianapolis. Michael Ford, Keith Ford and Frederick Malone were travelers in that vehicle. Ford contends that the only evidence giving rise to a suspicion of criminal activity was seized from the person of Frederick Malone, not from the passenger compartment of the vehicle. He contends that there was no evidence that Malone acted in concert with anyone and therefore the search of the trunk was not based upon probable cause to believe that fruits of criminal activity would be found there. "The court's determination of whether probable cause existed at the time of the search is a 'commonsense, practical question' to be judged from the totality of the circumstances." *Smith v. Thornburg,* 136 F.3d 1070, 1074–75 (6th Cir.1998). The court looks at the "objective facts known to the officers at the time of the search." *Id.* "Probable cause 'may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers.'" *United States v. Smith,* 510 F.3d 641, 648 (6th Cir.2007), *quoting, United States v. Lumpkin,* 159 F.3d 983, 986 (6th Cir.1998). As set forth in the magistrate judge's findings, The method by which the crimes were allegedly perpetrated by the defendants was meticulously detailed by the informant. Surveillance revealed the course of activities allegedly used by these individuals as described by the informant. Thereafter, a search of the person of Frederick Malone, an alleged co-conspirator and passenger in the vehicle of Michael Ford, yielded fruits of the alleged criminal activity. From the totality of the circumstances and all information known to the officers at the time of the stop, a fair probability existed that evidence of criminal activity would be found in the trunk. *United States v. Riedesel,* 987 F.2d 1383, 1389 (8th Cir.1993).

Objections having been made and for the reasons set forth herein, **IT IS HEREBY ORDERED AND ADJUDGED** that:

1. The objections of the defendant, Michael Ford to the findings and recommendations of the magistrate judge (DN 284) are **DENIED.**

2. The objection of the United States to the findings and recommendations of the magistrate judge (DN 285) is **GRANTED.**

3. The objections of the defendant, Christopher Allen Kittrell, to the findings and recommendations of the magistrate judge (DN 286) are **DENIED.**

4. The objections of the defendant, Kenneth L. Williams, to the findings and recommendations of the magistrate judge (DN 287) are **DENIED.**

5. The Findings of Fact, Conclusions of Law, and Recommendations of the United States Magistrate Judge (DN 279) are **ACCEPTED AND ADOPTED with the exception of the following:**

The findings of fact, conclusions of law, and recommendation with respect to the suppression of evidence from the person of Michael Ford (found at Magistrate's Report, pp. 61–63) are rejected. The court's analysis in this opinion with respect to the search of Michael Ford's person constitutes the ruling of the court on this issue. The evidence seized from the person of Michael Ford will not be suppressed.

6. The motions of the defendant, Kenneth L. Williams, to suppress evidence seized from the search of his home and vehicle (DNs 109, 110) are **GRANTED.**

7. The motion of the defendant, Kenneth L. Williams, seeking suppression of evidence relating to the seizure of his vehicle and the installation of an electronic tracking device (DN 64) is **GRANTED IN PART AND DENIED IN PART.**

8. The motion of the defendant, Michael Ford, to suppress evidence seized from his vehicle (DN 203) is **DENIED.**

9. The motion of the defendant, Christopher Allen Kittrell, to suppress evidence seized from his vehicle (DN 215) is **DENIED.**

10. The following items are **SUPPRESSED FROM EVIDENCE AT THE TRIAL OF THIS MATTER:**

A. The items seized from 9938 Apollo Court, Louisville, Kentucky, on January 4, 2006.

B. The items seized from the gold Suburban automobile of Kenneth L. Williams on January 4, 2006.

C. The photocopy of the storage unit rental receipt for Stor–All storage unit # 5592 obtained on December 21, 2005.

**IT IS SO ORDERED.**

## *FINDINGS OF FACT CONCLUSIONS OF LAW AND RECOMMENDATION*

DAVE WHALIN, United States Magistrate Judge.

### INTRODUCTION

This matter comes before the Court to consider various motions to suppress filed by several of the Defendants in this prosecution for conspiracy to commit bank fraud, identity theft, aggravated identity theft, obstruction of justice, and forfeiture.[1] The motions arise from the investigation of an alleged interstate ring of pickpockets. The Government claims that members of the ring would steal identification and credit cards from restaurant patrons and sports fans, then use them to falsely obtain merchandise and gift cards worth many thousands of dollars.

Five motions to suppress are now before the Court.[2] Defendant Kenneth L. Williams has moved to suppress from evidence information obtained by the placement of a tracking device on his automobile on Dec. 21, 2005.[3] He also has filed

---

**1.** (DN 125, Second Superseding Indictment)

**2.** (DN 64, 109, 110, 203 and 215)

**3.** (DN 64)

separate motions to suppress all items seized during the execution of search warrants on Jan. 4, 2006, at his home at 9938 Apollo Court in Louisville, Kentucky, and at storage unit # 5592 of a storage facility located at 10007 Dixie Hwy. in Louisville.[4] Defendant Michael Allen Ford has filed a motion to suppress all evidence obtained from the warrantless stop and search of his automobile on Jan. 15, 2006.[5] Defendant Christopher Allen Kittrell likewise has moved to suppress all evidence obtained from the separate warrantless stop of his own automobile on the same date.[6] The Court conducted an evidentiary hearing on these various motions on Feb. 9, 2009.[7] The parties have filed post-hearing memoranda of law.[8] Accordingly, the motions to suppress are now ripe for consideration.

**The Second Superseding Indictment.**

The present federal prosecution involves a complex, multi-defendant investigation of an alleged interstate pickpocket ring. Essentially, two conspiracies to commit bank fraud involving aggravated identity theft are alleged in the second superseding indictment filed by the United States. Count 1 of the indictment charges that between Jan. 1, 2000, and Jan. 25, 2006, the Defendants engaged in an ongoing conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344. These Defendants include Kenneth L. Williams, Kenneth A. Williams, Darrin Lee Williams, Sky Royce Greenlee (a/k/a Jason Caldwell), Frederick Malone, Christopher A. Kittrell, Michael A. Ford, Keith Ford and John Yarborough. The Government alleges in count one that the named Defendants used credit cards and credit card numbers belonging to other individuals, issued by federally-insured banks, to fraudulently obtain money, goods and services. According to the Government, the means and manner of the conspiracy involved various groups of Defendants traveling to restaurants and sporting events where they would attempt to steal the identification and credit cards of unsuspecting patrons. The Defendants would then confirm that the stolen credit cards were valid. Using an identification-making kit, they would create false identification to permit them to fraudulently use the stolen credit cards to falsely obtain a total of over $140,000 worth of goods and services.

The second superseding indictment sets out examples of the substantial steps taken by the conspirators in furtherance of the object of their conspiracy. For example, it alleges that Defendants Kenneth L. Williams and Kenneth A. Williams traveled to Detroit, Michigan, between May 25 and June 15, 2005, where, using false military identification, they fraudulently obtained three laptop computers purchased with stolen credit cards. The indictment continues to allege that Defendants Frederick Malone and Christopher A. Kittrell in September of 2005, traveled to St. Louis, Missouri, where they pickpocketed sports fans attending a St. Louis Rams football game, stealing their credit cards and identification, which they used in similar fraudulent transactions.

Count 1 next alleges that on Nov. 21, 2005, Defendants Kevin L. Williams, Sky Greenlee and John Yarborough pickpocketed a victim, J.G.M., at a Golden Corral Restaurant in Florence, Kentucky, and attempted to pickpocket another victim, A.H., on the same date at a Cracker Barrel Restaurant also in Florence. The

---

4. (DN 109, 110)

5. (DN 203).

6. (DN 215).

7. The suppression hearing was transcribed by court reporter Carola G. Strijek (DN 252).

8. (DN 255, 256, 257–259, 265, 272).

same group, along with Darrin L. Williams, is alleged in Count 1 to have pickpocketed a third victim, E.S.Sr., on Dec. 21, 2005, at a Speedway gas station in Louisville, where they allegedly disposed of identification documents from prior victims they had pickpocketed. Two days later, on Dec. 23, 2005, the same ring members allegedly engaged in transactions using the stolen credit cards to obtain $2,000 worth of goods from a Dillard's dept. store located in the Jefferson Mall in Louisville. Finally, Count 1 alleges that on Jan. 15, 2006, Defendants Frederick Malone, Christopher A. Kittrell, Michael Allen Ford and Keith Ford traveled by car from Louisville to the RCA Dome in Indianapolis, Indiana, taking with them an identification making kit, where they pickpocketed the wallet of victim D.R., containing the victim's identification and credit cards, and returned to Louisville.

Counts 2–4 of the second superseding indictment contain charges of identity theft against Defendants Kenneth L. Williams, Kenneth A. Williams, Darrin Lee Williams, Sky Greenlee and John Yarborough, all of whom are charged with the possession of a U.S. military identification document, knowingly produced without lawful authority, to wit, counterfeit military identification cards in violation of 18 U.S.C. § 1028(a)(6).

Counts 5–11 of the indictment charge the same Defendants with aggravated identity theft of seven victims as a result of the conspiracy to commit bank fraud alleged in Count 1. The Defendants· are alleged in these counts to have knowingly transferred, possessed and used without lawful authority the means of identification of the seven victims in the course of the events, and on the dates and times set forth above.[9]

Count 12 charges Kenneth L. Williams with obstruction of justice when he attempted on June 15, 2005, to discard an envelope containing receipts for computer purchases in the Eastern District of Michigan in an effort to impede a criminal investigation in violation of 18 U.S.C. § 1519. Count 13 charges a separate act of obstruction of justice by Defendants Frederick Malone, Christopher A. Kittrell, Michael A. Ford and Keith Ford, when they knowingly removed and threw away an electronic tracking device attached to the vehicle of Michael Ford on Jan. 15, 2006.

Counts 14–19 of the second superseding indictment contain charges that involve Defendants Kenneth A. Williams and James Quisenberry. Count 14 charges a second conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344. Specifically, the indictment alleges that in furtherance of the objects of this conspiracy, Kenneth A. Williams and Quisenberry, on or about May 17–18, 2006, entered the residence of E.M.H. at 1784 Wilson Ave. in Louisville, where they shot and killed E.M.H. and shot her two-year-old daughter while stealing credit cards and identification documents from a safe in the home. Kenneth A. Williams and Quisenberry then allegedly disposed of the stolen credit cards and identification documents belonging to the two victims near 2000 Crums Lane in Louisville, between May 18–21, 2006. Counts 15–19 of the second superseding indictment allege five acts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) and (c)(5) against the same two Defendants arising from the same sequence of events involving E.M.H. Count 20, the final count of the indictment, is a forfeiture count brought pursuant to 18 U.S.C. §§ 982 and 1028.

---

**9.** The indictment contains a chart that identifies the Defendants, the victim, the date and means of identification involved in each count 5–11 (DN 125, pp. 9–10, Cts 5–11).

## FINDINGS OF FACT

### a. The Investigation.

The motions to suppress now under review involve three vehicle stops and the execution of three search warrants. On Dec. 21, 2005, officers of the Louisville Metro Police Department (LMPD) performed a warrantless stop of the gray Lincoln Town Car of Kenneth L. Williams. Williams was arrested at that time for driving on a suspended driver's license. Police seized his automobile and towed it to the headquarters of the LMPD Intelligence Unit, where the vehicle was entered by technicians pursuant to a search warrant to install a permanent electronic tracking device. The vehicle subsequently was returned to Williams, who was kept under surveillance using the surreptitiously installed tracking device.

This surveillance led to the issuance of two more state search warrants on Jan. 4, 2006, one for Kenneth L. Williams' home and another for a storage unit he rented. The warrants were executed by LMPD officers on the day they were issued. The ensuing search of the storage unit by police uncovered numerous gift cards, $40,000 in cash, marijuana, equipment used to manufacture false identification cards, and a wallet containing stolen credit cards. The search of Kenneth L. Williams' home on Apollo Ct. and two vehicles found parked there revealed bags of newly purchased clothing, assorted gift cards, $4,800 in cash, several baggies of marijuana, and various items of merchandise. More gift cards and a rental receipt for the storage unit were discovered in one of the vehicles parked outside the home.

Subsequently, on Jan. 15, 2006, LMPD officers made separate warrantless stops of two vehicles, one driven by Defendant Michael A. Ford and the other by Christopher A. Kittrell, as they returned from a professional football game in Indianapolis. These warrantless vehicle stops were the result of information provided by Defendant Darrin Williams along with an investigation and surveillance by LMPD and federal law enforcement officers as described below.

On Dec. 9, 2005, Sgt. Denny Butler of the Intelligence Unit of the LMPD, was contacted by a detective with the police department of Florence, Kentucky. (DN 252, Transcript of hearing (TH) pp. 25, 28–29, 33–36). The Florence detective advised Butler during their telephone conversation, that stolen credit cards taken from a restaurant patron in Florence were being used in the Louisville area. At Sgt. Butler's request, the Florence detective electronically mailed him a surveillance photograph showing three black male suspects departing from a Cracker Barrel restaurant in a dark-colored Lincoln Town Car. (*Id.* at 33–36). The men were suspected of having attempted to steal the credit cards and identification of one of the restaurant patrons at the Cracker Barrel and at another local restaurant. Local police examined the Cracker Barrel surveillance photos and identified Defendants Kenneth L. Williams and Sky Greenlee as being two of the three suspects allegedly involved in the theft.[10] Investigation by the LMPD determined that Kenneth L. Williams in fact did own a gray Lincoln Town Car, license no. 815–AMD. (*Id.* at 37–38).

**10.** The method used to identify the Defendants from the surveillance photo was not stated in the affidavit later submitted in support of the search warrant authorizing the seizure of Williams' Town Car on Dec. 21, 2005, for the installation of the tracking device and apparently was not otherwise communicated to the issuing state court judge. It came to light in the Government's response to Defendant Williams' first motion to suppress. (DN 120, pp. 13–14).

Members of the LMPD Intelligence Unit attempted to set up surveillance on Williams' automobile. (DN 252, T.H. p. 25). Despite the involvement of a number of unmarked police vehicles, they were unable to maintain surveillance on Williams, a career criminal with a long criminal history, due to his evasive driving tactics. (*Id.* at 39–40). The officers, however, did manage to follow the Town Car to Kenneth L. Williams' home at 9938 Apollo Court in Louisville. (*Id.* at 39). Because the attempt at visual surveillance was not sufficient, Sgt. Butler decided that the officers should apply for a search warrant to attach a permanent, hidden electronic tracking device to the electrical system of the Town Car. (Id. at 40).

Sgt. Butler was in the process of drafting the search warrant on Dec. 21, 2005, when one of the LMPD Intelligence Unit's detectives, Officer Marcus Latham, observed Kenneth L. Williams driving the Town Car near Seventh Street and Racine in Louisville. (*Id.* at 40–41). Det. Latham and Sgt. Butler were both aware that Williams' operator's license had been suspended and therefore he was driving illegally. (DN 252, T.H. p. 25). A decision was made to stop the Town Car and arrest Williams for driving on a suspended operator's license. (*Id.* at 42).

LMPD uniformed officers ultimately stopped the Town Car in the parking lot of a Home Depot store located on Dixie Hwy. in Louisville. Officers took Williams into custody and placed him in the back of a police cruiser. Prior to being arrested, he telephoned his cousin, Cherie Chavon Liggons to request that she and his wife, Nicia Williams–Brown, come to the parking lot to recover his automobile. (DN 252, T.H. p. 58–60). When the women arrived at the parking lot, Kenneth L. Williams was already in custody in a police cruiser. (*Id.* at 61). Although the Town Car was parked in the hardware store's

parking lot, and not on the street, police refused to release the vehicle to the two women. (*Id.* at 61–62). After the women left, a police tow truck took the Lincoln Town Car to the local headquarters of the LMPD Intelligence Unit so that technicians could attach a permanent electronic tracking device to the electrical system of the automobile once the search warrant was obtained. (*Id.* at 47).

While these events were unfolding, Det. Juan Garrett of the LMPD Intelligence Unit was obtaining a search warrant to attach the electronic surveillance device from Chief Judge James Shake of the Jefferson Circuit Court. (DN 252, T.H. p. 26–27, 48). The search warrant and affidavit to attach the electronic surveillance device each contained the following information:

On 12–09–05 Florence KY police department sent surveillance photos from a Craker (sic) Barrel Restaurant, containing photos of three b/m individuals involved with the theft of a purse from a patron in the store. Detective from Florence stated the stolen credit cards were being used in the Louisville area and the suspects were seen leaving in a grey Lincoln Towncar, Mr. Kenneth L. Williams, b/m, DOB 02–22–1968, SSN 405–02–0883, was identified (sic) as one of the suspects. LMPD crimes against seniors unit stated they have similar reported crimes at local Cracker Barrel restaurants involving three b/m's. On 06–15–05 Kenneth L. Williams and a Kenneth A. Williams were stopped in Detroit Michigan and were in possession of fraudulent military identifications. On 12–16–05 Detectives from LMPD's Criminal Intelligence Unit observed Kenneth L. Williams and Kenneth A. Williams at the residence 9938 Appollo (sic) Ct. and both using the listed vehicle. Surveillance over the last week has been impossible due to Mr. Williams

driving techniques to avoid being followed.

Acting on the information received, affiant conducted the following independent investigation:

Since 12–15–05 the LMPD criminal intelligence unit has attempted to conduct surveillance on the listed vehicle and has lost the vehicle. On todays date Mr. Kenneth L. Williams was stopped for a traffic offense and subsequently arrested for driving on a suspended o/l. Mr. Kenneth L. Williams has an extensive criminal record. Criminal History reveals numerous arrest and convictions for fraud related issues ranging from fraudulent use of credit cards to theft by unlawful taking over $300.00. Mr. Williams has been a persistent felony offender in the first degree. The Florence Police Department, LMPD and the FBI have active felony criminal fraud investigations on Mr. Kenneth L. Williams.

Affiant has reasonable and probable cause to believe that the grounds exist for the issuance of a court order, based on the aforementioned facts, information and circumstances and affiant further prays that a court order be issued to authorize the affiant or any peace officer with authority in Jefferson County Kentucky, to attach, install and affix electronic tracking devices (beepers) to any watercraft/aircraft/motor vehicle(s), or in or to any cargo contained there in, used by said

A grey Lincoln Towncar KY Tag 815–AMD, Registered to Kenneth L. Williams.

(DN 65, Mot. to Suppress, Ex. 1, Town Car search warrant).

While Det. Garrett was obtaining the search warrant for the electronic tracking device, technicians with the Intelligence Unit were examining the exterior of the vehicle while awaiting verification of the warrant to begin the process of covertly attaching the electronic tracking device to Williams' car. (DN 253 T.H. p. 49–50). On receiving notice that Judge Shake had signed the search warrant at 1:25 p.m. on Dec. 21, 2005, technicians entered the Lincoln Town Car and began to prepare to attach the GPS tracking device. (*Id.* at 50). Photographs were taken of the interior of the Town Car so that all of the contents could be returned to their original position inside the vehicle to divert any possible suspicion of tampering. (*Id.* at 51–52). In the process of documenting the contents of the vehicle, officers photographed, removed, copied and returned a rental storage receipt for the aforementioned storage unit, unit # 5592 at the Stor–All facility on Dixie Highway. (*Id.* at 53–54). The rental receipt was found in a door pocket.

After technicians had finished installing the hidden electronic tracking device, Williams' Lincoln Town Car was towed to the LMPD regular impoundment lot where Williams, upon being released, recovered the vehicle without discovering the hidden tracking device. (DN 252, T.H. pp. 27–28, 55). LMPD officers then proceeded to continue their surveillance on the vehicle. This surveillance, along with other information gathered in the investigation, led LMPD Det. Stacey Redmon to obtain two search warrants from Judge Shake on Jan. 4, 2006. One of the warrants authorized the police to search Kenneth L. Williams' home at 9938 Apollo Court, along with his Town Car and a gold-colored Chevrolet Suburban. (DN 113, Ex. 1, Apollo Ct. search warrant).

The second search warrant authorized the police to search storage unit # 5592 at the Stor–All facility at 10007 Dixie Hwy. (DN 115, Ex. 1, Storage Unit search warrant). The search warrant for the Apollo Court residence authorized LMPD officers

to search for and seize items associated with the use or manufacture of stolen credit cards, personal identifications, gift cards, and military IDs, to include, but not limited to, computer equipment, receipts and any property obtained by fraudulent means. The search warrant for the rental storage unit contained similar language, but included any vehicle located inside the unit capable of concealing stolen or fraudulent credit cards and/or identifications.

In support of the search warrant for Kenneth L. Williams' home, Det. Redmon included the following information in her affidavit:

On the 9 day of December, 2005, at approximately 11:00 a.m. affiant received information from/observed: The Florence KY Police Department sent surveillance photos from a Cracker Barrel restaurant containing 3 unknown B/M's involved in thefts of wallets and purses. Stolen credit cards from the thefts were being used in the Louisville area. The 3 individuals were identified as Kenneth L. Williams, Sky Greenlee and John Yarborough. On 12–21–05, the LMPD Criminal Intelligence Unit attached a tracking device to the vehicle driven and registered to Kenneth L. Williams (pursuant to a search warrant and court order). On 12–23–05 Kenneth L. Williams, along with 3 other individuals took wallets from victims using force against the victims at Kirlands (sic) store in Oxmoor Mall and the Speedway store on the Outer Loop. Kenneth L. Williams and his 3 accomplices used the victims credit card from the Speedway offense at the Jefferson Mall Dillards 4 times purchasing $1500.00 worth of gift cards. Through surveillance and investigation detectives confirmed Kenneth L. Williams resides at 9938 Appollo (sic) Ct. Lou Ky. and has an extensive criminal history involving fraudulent criminal offenses.

(DN 113, Ex. 1, p. 2). Det. Redmon provided the following information in support of the search of storage unit 5592:

On the 21 day of December 2005 at approximately 3 p.m. affiant received information from/observed: executed a search warrant and search incidental to arrest on 12–21–05 on a Lincoln Towncar Ky tag 815.AMD, registered to Kenneth L. Williams and found a rental agreement between Stor–All Dixie and Kenneth L. Williams. Mr. Williams has rented unit # 5592 at Stor–All 10007 Dixie Hwy.

Acting on the information received, affiant conducted the following independent investigation:

Surveillance has indicated Mr. Williams frequants (sic) the storage unit prior to and/or directly after committing criminal acts. On 12–23–05 Mr. Williams and 3 associates stole wallets from 2 victims using force and fraudulently used stolen credit cards 4 separate times. A criminal history of Kenneth L. Williams reveals numerous convictions on crimes associated with theft and fraud offenses. Detectives confirmed with Stor–All Dixie that unit # 5592 is currently rented by Kenneth L. Williams.

Judge Shake reviewed both search warrants, which were presented by Det. Redmon simultaneously on Jan. 4, 2006. The judge signed both search warrants at approximately 2:35 p.m. that day.

LMPD officers then proceeded to immediately execute the warrants that afternoon. The search of 9938 Apollo Court began at 3:30 p.m. and ended at 5:15 p.m. Officers searched the home, Williams' Lincoln Town Car and a silver chevy Suburban located on the property. The search uncovered marijuana, bags of clothing, assorted gift cards, $4,800 in the house and more gift cards in both vehicles. (DN 114, seized property list). Other LMPD offi-

cers simultaneously executed the search warrant at the Stor–All rental unit where they discovered the earlier mentioned cash, credit cards and identification making equipment. The results of these two searches are the subject of motions to suppress filed by Kenneth L. Williams (DN 109, 110), who challenges the sufficiency of both the search warrant affidavits on their face.[11]

#### b. Vehicle Stops and Searches.

The final matter involves the warrantless police stop of Defendants Michael Ford and Christopher Kittrell's respective automobiles during the early evening of Sunday, Jan. 15, 2006, when both men were returning from a Colts professional football game held at the RCA Dome in Indianapolis. LMPD Sgt. Denny Butler testified concerning the circumstances that led to the stop of the vehicles. (DN 252, T.H. pp. 73–191). Butler explained that several days prior to Jan. 15, 2006, the LMPD received information from Defendant and co-conspirator Darrin L. Williams, who had been arrested on a separate robbery charge. (*Id.* at 74–75, 191–192). Darrin Williams advised the police that there would be two groups of individuals who would be traveling to the Indianapolis football game on Sunday, Jan. 15, to steal credit cards from sports fans attending the event. (*Id.*). Williams told the police that Ford and Kittrell would be traveling separately to the game on the 15th from their respective homes. (*Id.*). He identified Michael Ford's automobile as being a 1993 gray Buick Roadmaster. He also accompanied the police to Kittrell's neighborhood and pointed out Kittrell's car, a 1973 blue Ford Thunderbird.

Williams informed the police that Kittrell and Ford would leave Louisville early Sunday morning and drive separately to the game. Each of the two groups according to Williams would have between two-to-four members who would work in concert with each other to steal credit cards from sports fans. (*Id.* at 74–75). They would then immediately use the stolen credit cards to buy gift cards and merchandise at nearby Indianapolis stores that they had previously selected. (*Id.* at 75). Although Darrin Williams had been invited to go to Indianapolis to participate in the thefts, police instructed him not to go.

Based on this information from Darrin Williams, police established surveillance on Kittrell's Bank Street home in Louisville and on Ford's home at 18th and Magazine Streets. (*Id.*). To ensure that police would be able to maintain surveillance on the two automobiles, they decided to externally attach battery-powered tracking devices to each of the automobiles prior to their separate departure on Sunday morning. LMPD officers believed that effective surveillance would be essential because, according to Darrin Williams, the two groups would have maps of the city with them and would know the various store locations that they were going to visit, as well as the shortcuts to get to those locations. (*Id.* at 75–76).

The intended plan, as described to police by Williams, was that while one group of Defendants stole credit cards, the other group would take the stolen cards and immediately go to local stores to use them as soon as possible, while the other group continued to obtain more stolen credit cards and identification from unsuspecting fans. (*Id.*). Given the prior difficulty in

---

**11.** Williams also requested a *Franks* hearing by separate motion (DN 111), which the Magistrate Judge denied prior to the evidentiary hearing of Feb. 2, 2009 (DN 136). The District Court subsequently overruled the objections of Defendant Williams to the same order (DN 160, 181).

maintaining surveillance on Kenneth L. Williams' Lincoln Town Car, the police determined that installation of electronic tracking devices, known as "bird dogs," would be necessary to continue surveillance on the two cars as they traveled to Indianapolis. (*Id.* at 76).

Sgt. Butler observed one bird dog being attached to Michael Ford's automobile outside his home in the early morning hours of Jan. 15, 2006. (*Id.* at 76–77). The bird dog, as described by Butler, broadcasts a directional signal that permits individuals monitoring the signal to know the general direction of travel of the vehicle. (*Id.* at 77, 84). Unlike the electronic tracking device hard-wired to Kenneth L. Williams' Town Car, the bird dogs that police installed were self-powered transmitters with a limited battery life that were attached to the automobile's exterior using magnets. Butler explained that attachment of such a self-powered, external tracking device can be completed in a matter of seconds. Such tracking devices were installed by the LMPD on Michael Ford's Buick Roadmaster, and on Kittrell's Thunderbird, both of which Darrin Williams had specifically pointed out to the police earlier in the week. (*Id.* at 79).

Darrin Williams provided additional details prior to Jan. 15, about how the conspirators would operate upon arrival in Indianapolis. According to him, the two vehicles would park together once they arrived at the game site. (*Id.* at 80). Ford and Kittrell would leave the car keys to each vehicle under the floor mats in the respective vehicle in case either one of them was captured or arrested, so that the remaining members of the gang would have transportation home. (*Id.*). The vehicles also would park together so that the two groups could maintain communication with each other, and be ready to redirect their resources, if one group was able to successfully steal stolen credit cards and identification. (*Id.*).

Darrin Williams explained to police that the usual practice of the Defendants was to go to the bottleneck areas such as street intersections or ticket windows where large numbers of people were in contact with each other, so that it was easier to pickpocket their victims. Although Williams identified certain co-Defendants as individuals whom he thought might be going to Indianapolis on the 15th, he cautioned police that he could not be sure exactly who was going to go that day. (DN 252, T.H. p. 81).

Immediately prior to that Sunday the 15th, the LMPD pooled its resources with the U.S. Secret Service. (*Id.* at 83). The officers divided into two teams with one team, Sgt. Butler's team, being designated to maintain surveillance on Michael Ford and the other team, headed by Secret Service Special Agent Michael Davis, being tasked to follow Christopher Kittrell. (*Id.*).

As Darrin Williams predicted, Michael Ford's vehicle left Louisville early on the morning of the 15th. Sgt. Butler's team maintained surveillance on Ford during the approximately hour and a half trip to Indianapolis. En route, they learned that Kittrell's own automobile had departed Louisville later that morning for Indianapolis, also as Darrin Williams predicted, driving at a high rate of speed northward on I–65. (*Id.* at 85). Upon arrival, Sgt. Butler observed Ford's automobile parked on the grass next to a sidewalk several blocks south of the RCA Dome. (*Id.* at 85–86). Kittrell's automobile arrived later and parked directly next to Ford's automobile, again as predicted by Williams. (*Id.* at 86).

Officers observed the occupants of both automobiles join up and begin to walk toward the stadium. (*Id.*). Although the

officers attempted to follow the group on foot, they lost the group in the crowd approaching the stadium. Officers had alerted security at the RCA Dome to the situation and attempted to use the existing camera security system at the Dome to locate the Defendants, without much success. (*Id.*). Sgt. Butler estimated that 10–to–12 law enforcement officers, federal and local, were involved in the surveillance at that point. (*Id.*).

Officers did determine via the same security cameras that Kenneth L. Williams was present, although they did not see him in either of the two vehicles. (*Id.* at 87). Otherwise, the officers were not able to determine exactly who had traveled to Indianapolis with Michael Ford and Christopher Kittrell that day until the two vehicles were stopped late in the afternoon on their return to Louisville. At that time, Michael Ford's automobile contained Ford and two passengers, co-Defendants Fred Malone and Keith Ford. Kittrell's car contained only one passenger, Kenneth A. Williams. (*Id.* at 88).

After the officers lost track of the group walking in the crowd outside the stadium, they observed several members return to the automobiles carrying a bag. (*Id.*). One of the two cars then left. The officers, however, were not able to keep track of that vehicle after it drove off. (*Id.*). Upon its return, and the departure of the occupants, the officers decided to attach additional external tracking devices to both cars. These devices, unlike the "bird dogs" earlier attached were GPS tracking devices with two antennas that would enable officers monitoring their signal to determine the map grid locations of the vehicles being monitored. (*Id.* at 88–89).

After undercover officers attached the second set of electronic tracking devices to the undercarriage of each automobile, the Defendants returned to their respective cars at the end of the football game. As Michael Ford's Buick was pulling onto the street, the car bottomed out, scraping its rear end on the curb. (*Id.* at 89–90). When the occupants got out to examine the rear undercarriage of the car, police believe that they spotted one of the antennae hanging down from the recently attached GPS electronic tracking device. (*Id.* at 95–96). From that point forward Ford drove in a very cautious manner, carefully obeying all of the speed and traffic laws. (*Id.* at 90).

The occupants in Ford's car seemed to Sgt. Butler to be more curious about their surroundings. They appeared to be looking around as if to try to look for surveillance. (*Id.* at 91). Sgt. Butler explained that Ford's driving habits on the trip home that afternoon were significantly different from what Butler had observed earlier that morning when Ford was driving up to Indianapolis. In fact, the difference in driving was so significant as to make Sgt. Butler believe that the investigation probably had been compromised by the discovery of the GPS antennae. (*Id.*).

Law enforcement officers maintained surveillance on the two cars as they drove south on I–65 from Indianapolis. After approximately 15 miles, both vehicles pulled off the interstate and into the parking lot of a nearby McDonald's restaurant. (*Id.* at 92). Soon thereafter, the GPS signal from Michael Ford's automobile became inactive. Officers learned later, following the stop of both vehicles, that the tracking device had been removed from Ford's car and left in a garbage can inside the McDonald's restaurant. (*Id.*). On learning what had occurred to the tracking device, Sgt. Butler contacted the manager at the restaurant. (*Id.* at 93–94). The manager was able to recover the tracking device from the garbage can. Information concerning the discarded tracking device was provided by both Keith Ford and

Frederick Malone following the stop of Michael Ford's automobile later that same day. (*Id.*).

Sgt. Butler observed the two vehicles leave the McDonalds restaurant and resume heading southward on I-65. (*Id.* at 102). As he followed, Sgt. Butler notified the patrol division of the LMPD of the approaching vehicles so that marked LMPD police cruisers could stop Kittrell's and Ford's automobiles when they approached Louisville. (*Id.* at 101–102). Sgt. Butler related that when the Defendants saw two LMPD police cruisers parked at the side of the interstate near Louisville, their driving tactics changed dramatically. The two vehicles immediately split up. (*Id.* at 103). The Buick Roadmaster driven by Michael Ford exited the interstate and began to drive in an evasive manner. (*Id.*). After Ford's car crossed over the Second Street bridge into Louisville, it was stopped at the intersection of Second and Main Streets. (*Id.*).

According to Butler, the traffic stop of Ford's car occurred at approximately 7:45 p.m. (*Id.* at 104). Butler arrived on the scene of he traffic stop shortly after the vehicle was stopped. (*Id.*). On arriving, he identified all three of the Defendants in the vehicle as being Michael Ford, Keith Ford and Frederick Malone. (*Id.*). Sgt. Butler talked to each of the three Defendants and obtained verbal consent from Michael Ford to search the vehicle. (*Id.*). Butler testified that each of the three men consented to a search of their person. (*Id.* at 104–05).

At that point, police discovered the stolen identification taken from victim D.R. The identification was found in a shoulder pocket of Defendant Malone's windbreaker. When Malone saw the stolen ID, credit cards and Social Security card police discovered in his sleeve pocket, he hung his head. The officers additionally discovered three $100 bills on Michael Ford (*Id.*

at 107), along with a number of gift cards for various restaurants (*Id.* at 108) and three more $100 bills on Defendant Malone. (*Id.* at 114).

Subsequent investigation that day revealed that the Social Security card, Visa card, Macy's card and Indiana driver's license of victim D.R. were stolen from him at the Indianapolis colts' game earlier that same day, along with six $100 bills. (*Id.* at 108, 115). Although the officers did not learn of this theft under *after* the stop of Michael Ford's vehicle, Sgt. Butler testified that the basis for the stop was the criminal activity confirmed by the officers' observations of the Defendants (*Id.* at 111–112), which directly supported the detailed information provided by Darrin Williams, who had correctly identified the vehicles to be used, their owners, the location of the vehicles, the two groups' time of departure, their route, their proximity on arrival, the ultimate destination of the occupants, their manner of dress, and the operational procedures for their criminal activity (DN 252, T.H. pp. 112–113). Sgt. Butler explained that all of Darrin Williams' information was corroborated by the activities of Defendants Michael Ford and Christopher Kittrell that day. (*Id.* at 113). Accordingly, Butler explained that the police stopped Ford's automobile based on their belief that the occupants had been involved in the commission of a felony. (*Id.* at 114).

Examination of the clothing worn by the three men in the car revealed that each man was wearing layered clothing. Sgt. Butler found this fact to be significant because Darrin Williams also had advised police that one of the techniques used by the group to avoid being caught was to switch clothing and hats between each theft. (*Id.* at 116, 119). Also discovered in the vehicle was a medical card for victim C.R., a purse, and assorted empty wallets.

(*Id.*). Defendant Malone at the time of the stop had in his rear pants pocket a brown wallet that contained two small photographs capable of being placed over the top of a driver's license photograph in order to create false identification. (*Id.* at 117–18). Police found in the trunk of the car a power converter and a Polaroid camera, items described by Darrin Williams as being used to make fake IDs while traveling. (*Id.* at 116–117).

Sgt. Butler testified that following the stop of Michael Ford's vehicle, Defendant Malone voluntarily agreed to speak with police about the events of the day. (*Id.* at 119). Malone confirmed the information provided by Darrin Williams, adding that the only victim they successfully pickpocketed that day was D.R. According to Malone, the group was not having a good day and left Indianapolis promptly that afternoon because the Colts had lost the playoff game. (*Id.*). The loss meant that they would not have as easy a job of stealing wallets and purses since the crowd would be upset, as opposed to occasions when the home team wins, and the fans become boisterous and animated, making the job of stealing wallets much easier. (*Id.* at 119–120).

Det. Stacy Redmon of the LMPD was present at the stop of Defendant Kittrell's blue Ford Thunderbird. (DN 252, T.H. p. 193–194). Redmon testified that the stop occurred at the intersection of 22nd Street and Portland Ave. in Louisville. According to Redmon, Kittrell's car was stopped both for traffic violations and as a result of the ongoing criminal investigation. (*Id.* at 194). The specific traffic violation, according to Redmon, was reckless driving. (*Id.*). The detective, however, did not make the traffic stop herself. Instead, she and Special Agent Davis arranged for two marked patrol cars to make the traffic stop and arrived on the scene immediately thereafter. (*Id.* at 195).

Detective Redmon did observe, however, the driving behavior of Defendant Kittrell that led to the charge of reckless driving. (*Id.* at 196). According to her, Kittrell began speeding and weaving in and out of automobiles after passing the marked LMPD units stationed alongside the interstate just north of Louisville. (*Id.*). He ultimately was cited for both reckless driving and for a lack of automobile insurance. Following the initial stop, Kittrell's car was searched with his consent, according to Det. Redmon, who remained at the scene of the stop throughout the arrest of Defendant Kittrell and the search of his car. (*Id.* at 196–197). Redmon recalled that the entire car was searched and a number of clothing items seized, along with an empty wallet. (*Id.* at 197–198).

On Cross-examination, Redmon confirmed that Sgt. Butler made the order to make a stop of Kittrell's vehicle approximately an hour earlier. (*Id.* at 200–201). Redmon agreed that Kittrell was not charged with speeding or with making illegal lane changes, although he was cited for reckless driving and driving without car insurance. (*Id.* at 205, 211). Ultimately, the reckless driving charges were dismissed and Defendant Kittrell entered a plea of guilty to the non-insurance charge, which was amended to a second offense, according to Kittrell's attorney in the matter, Richard Receiver. (*Id.* at 218–219).

Defendant Michael Ford also testified concerning the events of Sunday, Jan. 15, 2006. According to Ford, he got up that morning at approximately 9 a.m. and went to Bates Memorial Church on Clay Street. (DN 252, T.H. pp. 220–221). After the service, he left the church at approximately 11 a.m. and went to pick up co-Defendants Keith Ford and Frederick Malone. (*Id.* at 221). The group then stopped briefly at his house where they ate and then left for Indianapolis at approximately

11:30 a.m. (*Id.* at 223–224). Ford denied that he ever gave Sgt. Butler permission to search his car at the traffic stop later that afternoon. (*Id.* at 221).

## CONCLUSIONS OF LAW

The Court begins its legal analysis with those issues that relate to the vehicle stop of Kenneth L. Williams' Lincoln Town Car on Dec. 21, 2005, and the subsequent towing of the vehicle to the LMPD Intelligence Unit headquarters where technicians installed the hidden electronic tracking device pursuant to the search warrant issued by Chief Judge Shake. Williams constitutionally challenges these events in a number of respects. Specifically, he argues that the pretextural warrantless stop of his vehicle, ostensibly made to arrest him for driving on a suspended operator's license, violated the Fourth Amendment's requirement of reasonableness. He also argues that the police lacked a reasonable basis under the Fourth Amendment to seize his car without a warrant so that it could be towed, when the vehicle was lawfully parked in a parking space at the Home Depot parking lot and Williams' wife and her friend were available at the scene to lawfully drive the vehicle away. Finally, Williams argues that the search warrant issued to permit the installation of the electronic tracking device was not supported by probable cause, and indeed, was based on so little information that the state judge could not have issued the search warrant in good faith under the Leon standard.

### 1. The Warrantless Stop of Dec. 21, 2005.

■ The initial Fourth Amendment issue involving the warrantless stop of Williams' automobile does not require extended analysis. Well-established case law permits law enforcement officers to stop a vehicle when either probable cause or a reasonable suspicion exists that the driver or other occupants of the vehicle, if any, are engaged in criminal activity. Under such circumstances, the police are permitted to make a traffic stop within the confines of the Fourth Amendment case law discussed immediately below.

■ Under the law, a seizure occurs within the meaning of the Fourth Amendment when a driver is detained, however briefly, during the course of a routine traffic stop. *See United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir.2006). Consequently, either probable cause or reasonable suspicion is required to justify the warrantless stop of an automobile. *Id.* The reasonableness of a warrantless investigative traffic stop by police is typically analyzed under the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ Under the *Terry* doctrine, law enforcement officers may make a warrantless stop of a person or an automobile "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity." *United States v. Hurst*, 228 F.3d 751, 756–57 (6th Cir.2000); *United States v. Sandridge*, 385 F.3d 1032 (6th Cir.2004) ("When a police officer conducts a brief investigatory stop of a person in a vehicle, 'the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.' ") (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).

■ Reasonable suspicion is determined by the totality of the circumstances. *United States v. Smith*, 263 F.3d 571, 588 (6th Cir.2001). The critical question is whether the officer's involved had a particularized and objective basis for suspecting criminal wrongdoing. *United States v.*

*Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Officers in making such investigatory stops are permitted to draw upon their professional experience and specialized training to make inferences from and deductions about the facts available to them that might not seem significant to an untrained individual. *Id.* at 418, 101 S.Ct. 690.

 While the likelihood of criminal activity need not rise to the level required to establish probable cause, or even to establish a preponderance of the evidence, the officers may not conduct an investigative detention based merely upon an unarticulated "hunch." *Terry,* 392 U.S. at 27. Unfortunately, the concept of reasonable suspicion is incapable of being reduced to a neat set of rules. Even factors which might independently seem innocent of themselves, when taken as a whole, may give rise to reasonable suspicion. See *Ornelas v. United States,* 517 U.S. 690, 695–696, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). See *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (discussing the level of suspicion required for a *Terry* stop). Further, the collective knowledge of all the law enforcement officers involved in the stop may be taken into consideration when determining whether reasonable suspicion exists. See *United States v. Miramonted,* 365 F.3d 902, 905 (10th Cir.2004) ("Probable cause and/or reasonable suspicion can rest on the collective knowledge of law enforcement, rather than solely on that of the arresting officer.").

 In this case, LMPD officers had more than a reasonable suspicion to conduct a stop of Kenneth L. Williams' Lincoln Town Car on Dec. 21, 2005. As Sgt. Butler testified, he and Officer Marcus Latham were both aware at the time of the stop that Kenneth L. Williams' operator's license had been suspended. As a result, Williams could not lawfully operate his car on the public streets of Louisville. See KRS 186.620(2) (West 1997) ("No person ... whose operator's license has been ... suspended ... shall operate any motor vehicle upon the highways while the license is ... suspended...."). Police therefore were lawfully entitled, and indeed required, to stop Williams from continuing to operate his motor vehicle without a valid license.

Further, Williams did not deny in the state court proceedings that followed his arrest that his license was suspended. In fact, he acknowledged that probable cause existed for the police to arrest him that day. The fact that the LMPD Intelligence Unit had a second, investigative reason for the stop and arrest of the Defendant does not render the actions of the police unconstitutional. *See Whren v. United States,* 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Blair,* 524 F.3d 740, 748 (6th Cir.2008) ("As we have previously held, 'police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.'") (citing *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir.1995)). Accordingly, an ulterior motive that co-exists with an otherwise lawful basis for a challenged stop made based upon probable cause or reasonable suspicion does not render the stop unlawful.

### 2. Towing of the Vehicle.

 During the evidentiary hearing, Kenneth L. Williams' attorney argued that even if the initial stop of his client's vehicle was lawful, police violated the Fourth Amendment when they removed the vehi-

cle from the hardware store parking lot, where it was lawfully parked, without first obtaining a search warrant. In his post-hearing reply brief, Williams continues the same argument citing *Arizona v. Gant,* — U.S. ——, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), and its recent restriction of the "search incident to arrest" doctrine, as further support for his challenge to the warrantless search and possible search of his vehicle.

No question exists that "police have seized the vehicle once they call a tow truck to take it away." *United States v. Richards,* 147 F.Supp.2d 786, 790–91 (E.D.Mich.2001) (citing *Lewis v. Cardwell,* 476 F.2d 467, 468 (6th Cir.1973), *reversed on other grounds,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974)). The critical issue therefore is whether the warrantless seizure of Defendant Williams' Town Car was reasonable within the meaning of the Fourth Amendment. A number of federal decisions discuss this exact issue. *See United States v. Coccia,* 446 F.3d 233, 237–41 (1st Cir.2006); *Workman v. Cardwell,* 471 F.2d 909, 910 (6th Cir.1972); *United States v. Goodrich,* 183 F.Supp.2d 135, 137–43 (D.Mass.2001).

The *Coccia* and *Goodrich* decisions are particularly helpful examples of when police may, and may not, lawfully make a warrantless seizure of an otherwise lawfully parked motor vehicle following the arrest of its operator. For example, in *Coccia,* the U.S. Court of Appeals for the First Circuit held that local Massachusetts police lawfully towed the automobile of a defendant arrested pursuant to an involuntary commitment warrant, even though his vehicle was otherwise lawfully parked in the parking lot of his psychiatrist. *Coccia,* 446 F.3d at 235–37. Citing the community caretaking exception to the warrant requirement, the First Circuit held that the circumstances surrounding the seizure of the automobile reasonably required police

to have the vehicle towed where: the vehicle operator appeared mentally disturbed and had made various threats indicating that he possibly possessed explosives and weapons; his car was packed full of all his personal possessions, which police concluded might include such dangerous items as explosives or firearms; and, no obvious alternative means existed to remove the vehicle from the doctor's parking lot. *Id.* at 239–240. Under these circumstances, the First Circuit held that the warrantless seizure of the vehicle to have it towed to the police impoundment lot was objectively reasonable under the Fourth Amendment, particularly where there was no argument made that the defendant's arrest or the removal of the vehicle was pretextural.

Application of the community caretaking function exception to the warrant requirement had exactly the opposite result in the *Goodrich* case. *Goodrich* involved an investigation of an armed robbery by local Massachusetts police who were attempting to execute outstanding arrest warrants for the defendant. *Goodrich,* 183 F.Supp.2d at 137. Police learned that the defendant had driven his sister-in-law's automobile to the local VFW club where his wife was working. Police located the suspect's vehicle parked in the lot and subsequently arrested the defendant inside the VFW hall. During the arrest, the defendant handed the keys to the automobile to his wife, who surrendered them to the police. Officers then proceeded to open the vehicle and search it without a search warrant. *Id.* During the search, they discovered a handgun used in the robberies located in a duffle bag inside the trunk of the car. The officers then had the vehicle towed to the police station where an inventory search was performed. (*Id.*).

Faced with these facts, the district court held that the actions of the officers in seizing and towing the defendant's car

without a warrant violated the reasonableness requirement of the Fourth Amendment. The district court in its decision offered the following explanation of the exception to the warrant requirement when police act in furtherance of their community caretaking function. In the words of the court:

> Pursuant to their 'community caretaking' functioning, the police have the authority to impound or tow a car that is endangering the public or is itself in danger. *See United States v. Rodriguez–Morales,* 929 F.2d 780, 785 (1st Cir.2001); *see also South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Fourth Amendment provides no direct prohibition of such a seizure, so long as the 'procedure employed (and its implementation) is reasonable' and there is a 'strong noninvestigatory justification' for the seizure. *Id.* The need for a noninvestigatory purpose and reasonable procedures to justify a warrantless seizure and inventory search was reemphasized by the Supreme Court in *Colorado v. Bertine,* 479 U.S. 367, 375, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).
>
> Goodrich argues that the police had no legitimate noninvestigatory purpose for removing his car because it was legally parked in a private lot and his wife could have driven it away or arranged to have it removed. A review of the case law supports the view that what distinguishes a permissible from an impermissible seizure of a legally parked car is whether the police had reason to believe that someone was available that could be entrusted with the car.

*Goodrich,* 183 F.Supp.2d at 139.

The district court in *Goodrich* then continued to discuss in detail a number of federal circuit court decisions dealing with the community caretaking function as a basis for the warrantless seizure of a vehicle, otherwise lawfully parked, when no third person is available to take possession of the automobile. *See United States v. Zapata,* 18 F.3d 971 (1st Cir.1994); *United States v. Duguay,* 93 F.3d 346 (7th Cir. 1996); *United States v. Pappas,* 735 F.2d 1232, 1234 (10th Cir.1984). According to the district court, these cited cases support a general proposition that "whether an appropriate person is available to move the car is central to an evaluation of the reasonableness of any decision to seize a vehicle." *Id.* at 140–41.

Here, no legitimate noninvestigative purpose existed for the police to remove Defendant Williams' automobile from the parking lot. The vehicle was lawfully parked and presented no danger to the public, nor was the vehicle itself shown to be at risk. Most importantly, Williams' wife and her friend, Cherie Liggons, were present and available to drive the vehicle back to Williams' Apollo Ct. home. Instead of releasing the automobile to the two women, the police had the vehicle towed purely for investigatory purposes so that the permanent electronic tracking device could be surreptitiously installed. Given these circumstances, the warrantless seizure of Williams' Town Car, while not prohibited in any fashion by the recent Gant decision, was nevertheless an objectively unreasonable warrantless seizure not supported by the community caretaking exception to the warrant requirement of the Fourth Amendment.

 This conclusion does not mean, however, that the ensuing installation of the tracking device was unlawful. This is so, the Court concludes, because the seizure of the vehicle was an inevitable event. The record is undisputed that Det. Juan Garrett obtained a search warrant from Chief Judge Shake soon after the seizure of the vehicle. The warrant empowered police to lawfully install in the vehicle a

hidden electronic tracking device powered by the electrical system of the car. The near-contemporaneous issuance of this warrant rendered the seizure of Williams' Town Car and implantation of the tracking device, inevitable irrespective of the preceding unlawful seizure.

The situation is analytically similar to the inevitable discovery doctrine under *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Under this doctrine, the exclusionary rule is inapplicable, even if the initial search or seizure is unlawful, where the evidence at issue would inevitably been discovered by lawful means. *See Murray v. United States*, 487 U.S. 533, 538, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) ("The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered."). As the Sixth Circuit explained in *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir.1995), *cert. denied*, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996):

> The inevitable discovery exception to the exclusionary rule applies when the Government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered.

*Id.*

In this regard, the Sixth Circuit has held that the Government may "satisfy its burden by showing that routine police procedures apart from the illegal search would have resulted in the discovery of the disputed evidence." *United States v. Ford*, 184 F.3d 566 (6th Cir.1999), *cert. denied*, 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d

1083 (2000). *See also United States v. Leake*, 95 F.3d 409, 411–412 (6th Cir.1996) ("Evidence obtained from an illegal source does not become 'sacred and inaccessible.'") (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). Other federal courts have applied this same inevitable discovery rational in analogous situations such as where police have unlawfully seized a vehicle or person, yet evidence of crime or contraband discovered thereafter is held to be admissible once the Government shows that it inevitably would have been obtained pursuant to a lawfully issued search warrant.

For example in *United States v. Procopio*, 88 F.3d 21, 27–28 (1st Cir.1996), *cert. denied*, 519 U.S. 1046, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996), Massachusetts police unlawfully opened and searched a locked briefcase located in the trunk of a car suddenly abandoned during a routine traffic stop of an automobile driven by a bank robbery suspect, Bernard Kiley. *Id.* at 27. Because local police department policy precluded the officers from opening the locked briefcase during an inventory search, the district court held that the warrantless search of the case did not fall within the inventory search exception to the warrant requirement. *Id.*

The First Circuit on appeal concluded that the contents of the briefcase, marijuana and incriminating documents detailing $100,000 in expenditures, would have been inevitably discovered pursuant to a search warrant that federal agents would have obtained once they learned from local police (who knew of the ongoing federal investigation) that Kiley, the feds prime suspect in an ongoing bank robbery investigation, had abandoned his car as he fled the traffic stop leaving behind in it the locked briefcase. *Procopio*, 88 F.3d at 27. *See also United States v. Parker*, 549 F.3d

5, 10 (1st Cir.2008) *cert. denied* —— U.S. ——, 129 S.Ct. 1688, 173 L.Ed.2d 1050 (2009)(even if defendant was unlawfully seized without a warrant when police summoned him and his roommates to step outside their hotel room, the subsequent discovery and seizure of a safe located in the hotel room was inevitable, where the officers involved were already preparing to obtain a search warrant for the room).

The same reasoning applies here with even greater force. Det. Garret was already in the process of obtaining the search warrant for the Town Car at the time the vehicle was towed to the LMPD intelligence unit headquarters. Judge Shake issued the warrant within approximately two hours after the vehicle was towed from the parking lot. Accordingly, using the inevitable discovery analogy, any possible illegality in removing the vehicle from the parking lot without a warrant was cured by the near immediate issuance of the search warrant for the very purpose of entering the vehicle to install the electronic tracking device.

Because it is clear that Williams' automobile inevitably would have been subject to search and seizure pursuant to the search warrant that Det. Garrett obtained from Judge Shake, the unlawful warrantless removal of the vehicle from the parking lot immediately prior to the issuance of the search warrant does not require the exclusion of any evidence. *United States*

*v. Alexander,* 540 F.3d 494, 502–04 (6th Cir.2008), cert. denied, —— U.S. ——, 129 S.Ct. 1923, 173 L.Ed.2d 1070 (2009); *United States v. Frederick,* 152 Fed.Appx. 470, 474 (6th Cir.2005) (discussing the concept of "inevitable seizure" as being analogous to the inevitable discovery doctrine in the context of the warrantless seizure of a rifle from a defendant, who moments later acknowledged that he was a convicted felon who could not lawfully possess the rifle, thus making its seizure inevitable).

### 3. Search Warrant for Electronic Tracking Device.

The next suppression issue involves the legality of the search warrant obtained by Det. Garrett from Chief Judge Shake at 1:25 p.m. on Dec. 21, 2005. Williams maintains in his original motion to suppress (DN 64) that the affidavit for the search warrant does not contain probable cause to justify the entry and installation of the permanent tracking device in his car. Williams argues that the limited information provided in the affidavit is inadequate to connect him to the alleged criminal activity in northern Kentucky on Dec. 9, 2005, or connect his vehicle with such activity so as to satisfy the probable cause requirement of the Fourth Amendment.[12]

### a. The Probable Cause Requirement

▮ The Fourth Amendment provides that, "No warrant shall issue but upon

---

**12.** Williams also argues in his original motion to suppress that law enforcement officers violated the time provisions of Rule 41(e)(2)(B), which requires that a federal warrant to install a tracking device not only identify the person or property to be tracked, but also specify a reasonable length of time that the device may be used, not to exceed 45 days from the date on which the warrant was issued. Fed.R.Crim.P. 41(e)(2)(B) (West 2009). This argument of the Defendant does not bear extended discussion for several reasons. First, the section of Rule 41 that Defen-

dant Williams relies on was not added to the rule until its effective date of Dec. 1, 2006, nearly one year *after* Det. Garrett obtained the state search warrant to affix the electronic tracking device from Judge Shake on Dec. 21, 2005. Additionally, Rule 41 of the Federal Rules of Criminal Procedure is not considered to be a rule of constitutional dimension that is applicable to the states. *Tabasko v. Barton,* 472 F.2d 871, 873 (6th Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2288, 36 L.Ed.2d 974 (1973). For these reasons, the Court gives no further consideration to this argument.

probable cause, supported by oath or affirmation ..." U.S. Const. Amend. IV. Probable cause is a fluid concept that is defined as being "reasonable grounds for belief, supported by less than prima facie proof, but more than mere suspicion" and exists "when there is a 'fair probability' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *Unites States v. Lattner,* 385 F.3d 947, 951 (6th Cir.2004), *cert. denied,* 543 U.S. 1095, 125 S.Ct. 979, 160 L.Ed.2d 908 (2005)(citing *United States v. Davidson,* 936 F.2d 856, 859 (6th Cir.1991)).

▪ In determining the existence of probable cause, a magistrate judge is to apply the "totality of the circumstances" analysis discussed in *Illinois v. Gates,* 462 U.S. 213, 238–38, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The Gates test requires the magistrate judge to "make a practical, common-sense decision, whether given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying the hearsay information," probable cause exists. *Id.; Hale v. Kart,* 396 F.3d 721, 725 (6th Cir.2005) ("The totality of the circumstances test requires us to evaluate the probabilities of finding criminal activities based on the evidence provided in the affidavit, as opposed to requiring that the evidence in the affidavit guarantees the discovery of criminal activity."). Thus, the magistrate judge looking to all of the circumstances set out in the affidavit must have a substantial basis to find probable cause to believe that fruits or evidence would be found at the place cited. *United States v. Trujillo,* 376 F.3d 593, 602–04 (6th Cir.2004).

▪ The affidavit is to be reviewed in a common sense, rather than a hypertechnical, manner. *United States v. Greene,* 250 F.3d 471, 479 (6th Cir.2001). The affidavit need not be perfect, nor must it use magic words or present proof sufficient to withstand rigorous cross-examination. *Hale,* 396 F.3d at 725. The reviewing court is required to pay great deference to the decision of the issuing judge and must not give a grudging or hypertechnical review. *Trujillo,* 376 F.3d at 602–04. Line-by-line scrutiny of the affidavit is not appropriate. *United States v. Johnson,* 351 F.3d 254, 259 (6th Cir.2003). Instead, it is only necessary that a substantial basis exist on which the issuing judge could determine probable cause.

▪ It is now well-established that hearsay may properly serve as the basis on which to issue a warrant so long as a substantial basis exists to credit the hearsay. *United States v. Ventresca,* 380 U.S. 102, 107–08, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Jones v. United States,* 362 U.S. 257, 272, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Probable cause, therefore, may be found in hearsay statements from reliable persons or in observations made by trained law enforcement officers. *See McDonald v. United States,* 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed. 153 (1948). *See United States v. Spears,* 965 F.2d 262, 277 (7th Cir.1992), *cert. denied,* 506 U.S. 989, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992).

▪ Examination of the search warrant affidavit submitted by Det. Garrett convinces the Court that the affidavit established a substantial basis on which Judge Shake could conclude that both the vehicle and its owner/operator were involved in criminal activity sufficient to justify the installation of the tracking device. As the affidavit noted, Defendant Williams had a lengthy criminal history that involved prior arrests and convictions for fraud related to the use of credit cards. The affidavit also revealed that Kenneth L. Williams and his nephew, Kenneth A. Williams, were stopped in Detroit approximately six months earlier and found to be

in possession of fraudulently manufactured military identification cards. Police further identified Kenneth L. Williams as being one of the three individuals shown in surveillance photographs taken during the incident at the Cracker Barrel restaurant in Florence, Kentucky, on Dec. 9, 2008. Not only was Williams identified, but his gray Lincoln Town Car also matched the general description of the Town Car seen driving away from the restaurant that day. When police attempted to maintain visual surveillance on the Town Car, Williams began driving in an evasive manner, which made it impossible for the officers to successfully keep him in sight while following him during the week of Dec. 15, 2005, prior to the issuance of the search warrant. Additionally, Louisville police had recently reported that similar crimes involving senior citizens were being committed by three black males at Cracker Barrel restaurants in the local area.

Taking the totality of the above facts in a commonsense fashion, all of the circumstances set forth in the affidavit raise a fair probability that both Williams and his vehicle were involved in criminal activity such that the installation of the tracking device was not unconstitutional, arguments of the Defendant to the contrary notwithstanding. While it may indeed be true that the affidavit of Det. Garrett does not specify how the police identified Defendant Williams from the Cracker Barrel surveillance photographs in Florence, Kentucky, a commonsense reading of the affidavit as a whole would lead the reader to believe that it occurred in the context of the police investigation. The likelihood of Williams' involvement in the Florence crime is supported by the information concerning: (1) Williams lengthy prior criminal history of committing similar credit-card and false identification offenses; (2) the recent use of the stolen Northern Kentucky credit cards in the Louisville area where Williams was known by police to reside;

(3) the similar credit card thefts involving elderly restaurant patrons victimized by three black males in the Louisville area; (4) the involvement of Williams' nephew in prior offenses, similar to the involvement of multiple defendants in the northern Kentucky incidents; (5) the similarity in make, model and appearance of Williams automobile with that seen on the surveillance photographs departing from the Cracker Barrel restaurant immediately following the alleged offense; and (6) Williams' conscious efforts at evasive driving once he realized that LMPD officers were following him as part of their investigation of the series of credit card and identity card thefts in northern Kentucky and Louisville.

All of these circumstances set forth in the affidavit of Det. Garrett establish a substantial basis for "a nexus between the place to be searched and the evidence to be sought." *United States v. Frazier,* 423 F.3d 526, 532 (6th Cir.2005); *United States v. Williams,* 544 F.3d 683 (6th Cir. 2008)(the nexus between a place to be search and an item to be seized may sometimes be inferred). *See also, United States v. Martin,* 526 F.3d 926, 936–37 (6th Cir.2008)("[A]n affidavit is not insufficient merely because it lacks explicitness of detail and every statement is not corroborated."); *United States v. May,* 399 F.3d 817, 826 (6th Cir.2005)(an affidavit need not contain a detailed factual basis for every statement therein in order to support the judge's finding of probable cause). Accordingly, no Fourth Amendment violation arose from the issuance of the search warrant on December 21 merely because the issuing judge was not advised how LMPD identified Defendant Williams from the surveillance tape.

In fact, the Court concludes that the question is not particularly close, given the liberal standard for establishing probable

cause and the information contained in the affidavit submitted by Det. Garrett. Yet even were the Court to conclude otherwise, the good-faith exception created in *United States v. Leon,* 468 U.S. 897, 905, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which permits the admission of evidence that is "seized in reasonable good-faith reliance on a search warrant subsequently determined to be defective," *United States v. Paull,* 551 F.3d 516, 523 (6th Cir.2009)(quoting *Leon,* 468 U.S. at 905, 104 S.Ct. 3405), would require the Court to uphold the installation of the electronic tracking device and the information obtained thereby. A reasonably well-trained police officer could have relied on the warrant in an objectively reasonable belief of its lawfulness. There is no indication that Judge Shake acted as a mere rubber stamp or that the affidavit was so devoid of information as to be a "bare bones" affidavit unworthy of belief by a reasonably well-trained officer. The Defendant has not persuasively alleged, and the Court has not found, there to be any indication that the information contained in the affidavit was deliberately or recklessly false so as to preclude a finding of good faith. *United States v. Carpenter,* 360 F.3d 591, 596–97 (6th Cir.2004). Exclusion therefor is not appropriate.

### b. The Scope of the Warrant.

■■■ A more difficult question is raised, however, by the actions of the police in removing and photocopying the rental receipt located in the door pocket of Williams' automobile.[13] Williams in his motion to suppress suggests that this action by the police clearly exceeded the legitimate scope of the search warrant and therefore constituted an unlawful search and seizure unrelated to the installation of the electronic tracking device. He reasons that as a result of this unlawful activity, all information obtained concerning the storage unit # 5592 at the Stor–All facility should be suppressed as well as any items seized as a result of the execution of the search warrant for the same storage unit. The Government maintains that the actions of the officers in removing and photocopying the receipt did not violate any personal right of Williams as the mere act of removing and photocopying the receipt only to return it to the vehicle did not constitute an unlawful seizure. Alternatively, the Government reasons that the receipt, if seized, was lawfully taken from the vehicle under the "plain view" exception to the warrant requirement of the Fourth Amendment.

Little question exists in the Court's mind that the Government seized the rental receipt within the meaning of the Fourth Amendment when it took possession of the receipt, removed it from Williams' Town Car, and photocopied the receipt for its own investigative purposes apart from the attachment of the tracking device. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." IV Amend. The literal text of the Fourth Amendment accordingly extends its protection to unreasonable seizures of personal property, as well as those seizures that involve the individual. *See Farm Labor Organizing Committee v.*

---

**13.** The exact location of the receipt in the vehicle remains something of an unresolved question at this time. The United States has proffered that the receipt was discovered in plain view in a door pocket of the automobile. The Government concedes, however, that no witness at the suppression hearing so testified. The court nevertheless will assume, solely for the purpose of analysis, that the receipt was actually seen in the passenger-side door pocket of the vehicle. As will be shown this assumption does not affect the ultimate outcome of the legal analysis.

*Ohio State Hwy. Patrol,* 308 F.3d 523, 543 (6th Cir.2002) (citing *United States v. Place,* 462 U.S. 696, 700–01, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). *See also United States v. Jacobsen,* 466 U.S. 109, 120–21, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (detention of a package sent by private carrier was held to be a "seizure" subject to the reasonableness requirement of the Fourth Amendment). Thus, a seizure of personal property requires probable cause just like the seizure of a person. *Place,* 462 U.S. at 701, 103 S.Ct. 2637.

An exception does exist, however, in those situations that involve extremely brief detentions of personal effects based upon reasonable suspicion that falls short of probable cause so long as any such detention is minimally intrusive. *Farm Labor Organizing Committee,* 308 F.3d at 544 (citing *Place,* 462 U.S. at 706, 103 S.Ct. 2637). Such situations nevertheless require that the Government have at least reasonable suspicion that the item at issue contains contraband or evidence of a crime. *Place,* 462 U.S. at 706, 103 S.Ct. 2637 ("Some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interest that strong countervailing Government interest will justify seizure based only on a specific articulable fact that the property contains contraband or evidence of a crime."). *See also United States v. Saperstein,* 723 F.2d 1221, 1231 (6th Cir.1983) ("Seizures of personal effects when based on anything less than probable cause" are permitted only to the extent that such seizures satisfy the standards of reasonableness that arise under a *Terry* investigative detention).

■ To determine the legality of any seizure of personal property, the Court therefor must first determine whether the detaining officer has a reasonable and articulable suspicion connected with criminal activity. *United States v. Sanders,* 719 F.2d 882, 887 (6th Cir.1983). In *Thomas*

*v. Cohen,* 304 F.3d 563, 569–70, *cert. denied,* 538 U.S. 1032, 123 S.Ct. 2075, 155 L.Ed.2d 1061 (2003), the Sixth Circuit explained that the definition for the seizure of an item flows from the same Fourth Amendment source as that of the seizure of a person so that any meaningful interference, albeit relatively brief, may be deemed a seizure. *Thomas,* 304 F.3d at 569–70 (citing *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652). *Thomas* explains that "this expansive definition is necessary because a seizure threatens an individual's distinct interest in retaining possession of his or her property." *Id.* (citing *Texas v. Brown,* 460 U.S. 730, 747–48, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)). Thus, a seizure subject to Fourth Amendment restraints will occur whenever a Government agent in some fashion meaningfully interferes with the possessory interest of the property owner however briefly. *Thomas,* 304 F.3d at 572.

LMPD Intelligence Unit officers assigned to install the electronic tracking device in Williams' car undeniably took physical possession of the rental storage unit receipt found in the automobile. Testimony at the evidentiary suppression hearing reveals that the same officers removed the receipt from the automobile. At the time the receipt was removed, the officers had no idea what particular connection the receipt may have had to the investigation at hand. At best the officers had merely a bare hunch that the receipt *might* later prove to be valuable to them in their investigation. Although subsequent events later proved them correct in this regard, it certainly cannot be concluded that such a reasonable suspicion existed at the time of removal; nor can the Court conclude that the Defendant's possessory interest in the same documentation was in any sense *di minimus* simply because the officers eventually returned the receipt to the car after making a photocopy of it. At

most, it can fairly be observed that no permanent seizure of the receipt occurred, since the receipt was returned to the vehicle after the police had photocopied it for the purpose of their investigative efforts. *See gen. Fox v. Van Oosterum,* 176 F.3d 342, 351 (6th Cir.1999). A seizure of the receipt nonetheless did occur.

The Court further believes that the same actions of the officers constituted not only an unlawful seizure but also an unlawful search outside the scope of the search warrant issued by Judge Shake. A search occurs when an individual's legitimate interest in maintaining personal privacy is intruded on by the Government *Thomas,* 304 F.3d at 569. Williams had a legitimate expectation that the information contained on the rental receipt allegedly located in the door pocket of his car would remain private. Thus, the act of photocopying the receipt in order to obtain that information for use in a criminal investigation of Williams and his codefendants would seem to this Court to readily satisfy the definition of a search under the Fourth Amendment.

■■■ The Government appears to implicitly acknowledge as much given its alternative argument that such a search would be justified under the plain view doctrine. The Court has significant difficulty with this proposition for several reasons. First, the Court has reservations accepting the representation of the Government that the rental receipt, which the Government concedes was located in a door pocket in the car, was found in "plain view." Nevertheless, as noted in footnote 11, the Court will presume for the purpose of this report and recommendation that the officers engaged in the installation of the electronic tracking device were able to see the face of the rental receipt without first having to remove the receipt from the door pocket.

■■■ The plain view doctrine provides that "if police are lawfully in a position from which they view an object, [and] if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Campbell,* 549 F.3d 364, 373(6th Cir. 2008) (citing *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). The burden falls directly on the Government to prove the existence of this exception to the warrant requirement. *United States v. Haynes,* 301 F.3d 669, 677 (6th Cir.2002).

Nothing in the testimony of any of the Government's agents indicates that the significance of the rental receipt was immediately apparent to them upon its discovery. To the contrary, the only testimony suggests that the officers did not know of the significance of rental receipt at the time, but decided to copy it just the same in case it became relevant during the course of their investigation. In other words, the officers simply were playing a hunch. As previously noted, the fact that their hunch ultimately turned out to be correct does not retroactively justify their warrantless search and seizure of the rental receipt, which cannot be justified by the plain view doctrine given the absence of proof required to meet all three elements of the doctrine. *See Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (Plain view doctrine did not justify the warrantless search of stereo equipment from the apartment of the defendant where the searching officers had insufficient indication that the equipment was stolen property until after they manipulated the stereo to obtain the serial number from the equipment); *Shamaeizadeh v. Cunigan,* 338 F.3d 535, 555 (6th Cir.2003) (noting that if the incriminating nature of an object is not immediately apparent to the officer, but merely appears to be suspi-

cious, and further investigation is required to establish probable cause with the object's association with criminal activity, then the plain view doctrine is not satisfied). *See also United States v. Garcia,* 496 F.3d 495, 510–13 (6th Cir.2007) (discussing *Cunigan* ).

In sum, the Court concludes that the LMPD officers involved in the installation of the electronic tracking device on December 21, 2005, exceeded the scope of the search warrant when they seized and copied the rental storage unit receipt for later use in their investigation. This search and seizure was not authorized by the search warrant obtained by Det. Garrett that afternoon. The search warrant obtained by Garrett authorized the officers to "attach a covert tracking device to the vehicle" (DN 6, p. 1). Removal of the rental receipt from the vehicle was not necessary in order to install or affix the electronic tracking device therein, nor was it necessary for the officers to photocopy the same. Accordingly the search and seizure of the same receipt fell outside the boundaries authorized by the search warrant and was not justified by the plain view exception to the warrant.

The only remaining question is whether the inevitable discovery doctrine would have resulted in the officers' eventual discovery of the rental storage unit through the normal course of their investigation. The Government argues the same in its post-hearing brief where its final fall-back position is the inevitable discovery of the storage unit given its surveillance of Defendant Williams vehicle following the installation of the tracking device on December 21.

The Court has discussed the inevitable discovery doctrine previously in this recommendation at pp. 30–31. Essentially, the question is whether the Government has demonstrated the existence of an independent, untainted investigation that inevitably would have uncovered the existence of Williams' rental storage unit. *United States v. Kennedy,* 61 F.3d at 499. If the Government shows that routine police procedures, apart from the illegal search and seizure of the rental storage receipt, would have resulted in the discovery of the storage unit, then the prior illegal search and seizure of the receipt will not taint the subsequent search of the storage unit pursuant to search warrant. *See United States v. Leake,* 95 F.3d at 411–12 (citing *Silverthorne Lumber Co.,* 251 U.S. at 392, 40 S.Ct. 182).

Here, the LMPD had lawfully installed the electronic tracking device pursuant to the earlier issued warrant signed by Chief Judge Shake. The police maintained on-going surveillance of Williams' automobile and indeed watched as its occupants committed various crimes while driving about Jefferson County, Kentucky on Dec. 23, 2005. It appears clear to the Court that the police ultimately would have discovered the existence of the rental storage unit on Dixie Hwy. through their normal investigative techniques such as the enhanced surveillance of the vehicle. Accordingly, the rental receipt, as a product of that unlawful search and seizure, may not be introduced against the Defendants in the Government's case-in-chief. Items obtained from the rental storage unit due to the execution of the separate search warrant are not subject to exclusion as the Court explains below in its recommendation.

**4. Search Warrant for 9938 Apollo Court.**

 The probable cause standard requires that Redmon's affidavit contain a substantial basis for the issuing court to conclude that a nexus existed between Williams' home and the evidence of credit card and identification theft that the police

sought to discover.[14] In other words, the affidavit must show that a reasonable probability existed on Jan. 4, 2006, that evidence of the stolen IDs and credit cards, gift cards, and other merchandise fraudulently obtained with stolen credit cards, would be found at the home of Kenneth L. Williams and the vehicles parked outside it upon execution of the search warrant. *United States v. Frazier,* 423 F.3d at 532.

What is not critical to the probable cause determination is whether the owner of the property was necessarily suspected of criminal activity himself, but rather whether "there is a reasonable cause to believe that specific things to be searched for and seized are located on the property to which entry is sought...." *United States v. McPhearson,* 469 F.3d 518, 524 (6th Cir.2006) (citing *Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)). The mere allegation that a specific, named individual is a criminal, or has engaged in criminal activity, without more, will not be sufficient of itself to tie the alleged criminal activity to a particular abode. *United States v. Savoca,* 761 F.2d 292, 295 (6th Cir.1985) (inference that bank robbers tend to conceal evidence in hotel rooms, without more, was not sufficient to support a search of the defendants' Arizona hotel room where the defendants were wanted for an Ohio bank robbery that occurred several months earlier).

Unfortunately for the Government, the search warrant affidavit submitted by Det. Redmon for 9938 Apollo Court fails to contain information on which the issuing judge could have determined that a substantial basis existed to believe that evidence or fruits of Defendant Kevin L. Williams' alleged criminal activity would be found in his home on January 4, 2006. Certainly, the affidavit is long on facts

concerning the Cracker Barrel incident in Florence, Ky. on Dec. 9, 2005, as well as the wallet thefts that occurred at the Oxmoor Mall and Speedway store on Dec. 23, 2005. It also directly relates the installation of the tracking device to the Lincoln Town Car driven by and registered to Defendant Williams. What the affidavit does *not* do, however, is to establish an adequate connection between these events and Kenneth L. Williams' home so as to make it sufficiently likely that evidence of these crimes would be discovered in a search of his home on Jan. 4, 2006.

The mere fact that the search warrant affidavit indicates that Kenneth L. Williams is a thief and pickpocket who has a history of criminal activity in the Louisville area, and likewise resides in that area, does not raise the inference that evidence of his criminal activities, particularly the thefts of wallets and purses, would be recovered from his home on the day of the search. In fact, the affidavit contains absolutely no information that any criminal activity or evidence of criminal activity had been seen on or about the property at 9938 Apollo Court or was known to be located there in January of 2006. *Cf. United States v. Carpenter,* 360 F.3d 591, 594–95 (6th Cir.2004) (fact that marijuana was seen growing "near" the defendant's residence, and that a road ran nearby, were insufficient to establish the required nexus between the residence and evidence of marijuana manufacturing).

Indeed, the affidavit of Det. Redmon is so deficient in this regard that the good faith exception to the exclusionary rule created by *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) cannot be successfully relied upon by the Government to avoid exclusion of the evidence seized from Williams' home or the Suburban automobile. An objec-

---

**14.** The contents of the affidavit are set out at page 11 of this report.

tively reasonable officer simply would have no legitimate grounds to believe that the warrant was properly issued given the complete absence of *indicia* of probable cause "as to render official belief in its existence entirely unreasonable." *Id.; Carpenter,* 360 F.3d at 595. *Cf. United States v. Mendizabal,* 214 Fed.Appx. 496, 500–01 (6th Cir.2006) (even if warrant failed to establish nexus between defendant's criminal activities and his home, the Leon good-faith exception would apply to prevent exclusion where the affidavit established that (1) a confidential informant had met the defendant drug dealer at his home, (2) had discussed cocaine transactions at the home, and (3) the experience of the investigating agent as set out in the affidavit indicated that drug traffickers keep records of their transactions in their homes).

None of the above information, found to be adequate in *Mendizabal* to satisfy the Leon good faith exception is present in the current case. Except for the final sentence of Redmon's affidavit that indicates that police have confirmed by surveillance that Williams resides at Apollo Court, there is absolutely nothing that in any fashion links Williams' criminal activities to that address. To the contrary, one might reasonably argue that to the extent the LMPD officers knew that Defendant Williams had recently rented storage unit # 5592, they would have reason to believe that evidence of his crimes would *not* be found at his home, but more likely would be secreted at the Stor–All storage unit he recently had rented. Importantly, the affidavit for the storage unit states that the police had observed Williams "... frequants (sic) the storage unit prior to and/or directly after committing criminal acts." This affidavit was submitted by Det. Redmon to Judge Shake along with the affidavit for the search warrant for the Apollo Court property.

For these reasons, no reasonable officer could rely on the "bare bones" affidavit of Det. Redmon. Any items seized from the home of Defendant Kenneth L. Williams must be suppressed from evidence, as well as any items taken from the gold Suburban automobile parked at the home at the time of the search. Once again, the affidavit contains absolutely no information whatsoever about this vehicle. Its mere location on the property, without more, is not sufficient to justify the seizure of any items contained therein.

On the other hand, to the extent that the same search warrant requested the search of Williams' Lincoln Town Car, the warrant contains more than adequate information on which the issuing judge could find a substantial basis to believe that fruits or evidence of identity and credit card theft would be found in this vehicle. Williams' Town Car was the same vehicle noted to be seen leaving the Cracker Barrel restaurant on Dec. 9, 2005, after the attempted theft of ID and credit cards from a restaurant patron. Likewise, his Town Car was the same vehicle that was stopped on Dec. 23, 2005, after police observed Williams and two other individuals, Sky Greenlee and John Yarborough, stealing wallets from victims at a local shopping mall and gas station, and then using the same stolen credit cards to fraudulently obtain merchandise and gift cards.

These facts establish a substantial basis for the Court to conclude that evidence of Williams' criminal activities would likely be found on Jan. 4, 2006, in the Lincoln Town Car, his personal automobile. Accordingly, to this extent, and this extent only, the motion to suppress should be **DENIED.** In all other respects, the motion to suppress should be **GRANTED,** given the complete failure of the search warrant affidavit to establish a nexus between the home of Kenneth L. Williams on Apollo

Ct., the gold (silver) Suburban automobile and his alleged criminal activities.

### 5. Search Warrant for Storage Unit # 5592.

■ The Court continues its probable cause analysis with the search warrant affidavit submitted by Det. Redmon for unit # 5592 of the Stor–All storage facility rented by Defendant Kenneth L. Williams. As noted, police first learned of unit # 5592 when they discovered a rental receipt for the unit in Williams' automobile while technicians were installing the electronic tracking device in the car on Dec. 21, 2005. Det. Redmon's affidavit relates not only the discovery of the rental agreement, but also the police surveillance of the storage unit. Police confirmed Williams' visit to the storage unit prior to and directly after committing the credit card and ID thefts in the Louisville area that December. The affidavit also relates information of Williams' numerous convictions for theft and fraud-related crimes and confirms that the storage unit remained rented in Williams' name as of the date on which Det. Redmon applied for a search warrant for the unit.

The commonsense, practical view of these facts would readily lead the issuing judge to conclude that a sufficient nexus had been established between Williams' alleged criminal activities involving the theft of ID and credit cards and his use of storage unit # 5592. In fact, the affidavit indicates that officers observed Williams prior to and after criminal events, visiting the very same storage unit. This information is more than adequate to establish probable cause to believe that fruits or evidence of Williams' ongoing criminal activities would be found in the same storage unit on Jan. 4, 2006, approximately two weeks after police witnessed the criminal activity of December 23, 2005.

A number of federal court decisions support this conclusion. *See United States v. Curry,* 538 F.3d 718, 729–30 (7th Cir.2008) (search warrant affidavit that related that suspected bank robber was seen attempting to pass large amounts of dye stained currency, and was seen coming and going from a storage rental unit rented in his name was sufficient to establish probable cause to believe that evidence of the bank robbery would be found in the storage unit); *United States v. Kellogg,* 202 Fed. Appx. 96, 103–04 (6th Cir.2006) (search warrant established probable cause to search for child pornography in defendant's storage rental unit where (1) thousands of pornographic images had been discovered in the defendant's home and hidden in a nearby barn, (2) the defendant was known to have asked a friend about local storage facilities, and (3) had, in fact, recently rented a local storage facility); *United States v. Williams,* 162 Fed.Appx. 884, 886–87 (11th Cir.2006) (probable cause supported issuance of search warrant for storage facility of a drug defendant where the affidavit established that the defendant had an ongoing connection to the unit, had rented the unit using a false identity, had amassed significant cash and assets and, according to his co-defendants, had used the unit to hide drugs and money); *United States v. Appleby,* 975 F.2d 1384, 1386 (8th Cir.1992) (probable cause existed to issue search warrant for storage unit where the defendant had been under investigation for operation of an illegal methamphetamine lab and a receipt for the storage unit had been discovered during a search of his motel room uncovering evidence of illegal drug activity); *United States v. Warren,* 181 F.Supp.2d 1232, 1247 (D.Kan.2001) (same). For the above reasons, the motion of Defendant Kenneth L. Williams to suppress the items seized from storage unit # 5592 should be **DENIED.**

### 6. Warrantless Traffic Stops of Jan. 15, 2006.

The final two motions to be considered are those of Defendants Michael Ford and Christopher Kittrell to suppress items seized by the police following the warrantless stop of their vehicles in the early evening of Jan. 15, 2006. Both vehicles were then returning from Indianapolis where they had been under constant surveillance by local and federal law enforcement officers based on information recently provided by co-Defendant Darrin Williams. Williams advised LMPD officers earlier that week that two groups would be traveling to the Indianapolis Colts football game to steal wallets · and purses in order to obtain ID and credit cards, which they would immediately use to make fraudulent purchases in the area. Sgt. Butler testified at the evidentiary hearing that he ordered uniformed LMPD officers to stop Ford's and Kittrell's cars based on his conclusion that the events officers witnessed during the day-long surveillance created probable cause to believe that evidence and fruits of criminal activity would be found in both vehicles. In fact, the vehicle stops did yield significant evidence, particularly in the case of Defendant Malone, who had on his person in an exterior sleeve pocket of his windbreaker ID and credit cards stolen from victim D.R. earlier that afternoon at the football game.

### a. Tracking Devices.

 Michael Allen Ford first challenges the lawfulness of placing the external tracking devices, or "bird dogs," on his automobile. Two such devices were externally attached to his car by police, one in the early morning hours of the 15th and the other later that afternoon in Indianapolis while Ford and the other suspects were attending the Colts football game. Ford now insists that the warrantless external attachment of these self-powered tracking devices violated his Fourth Amendment protection from unreasonable search and seizure.[15]

Since 1983, the Supreme Court has held that no legitimate expectation of privacy exists where the Government merely uses a radio transmitter to maintain surveillance of a vehicle traveling on public streets and highways. This is so because "a person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in its movements from one place to another." *United States v. Knotts,* 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). *See also United States v. Cassity,* 720 F.2d 451, 454–457 (6th Cir.1983), *vacated in part, United States v. Cassity,* 468 U.S. 1212, 104 S.Ct. 3581, 82 L.Ed.2d 879 (1984) (discussing *Knotts* as relying on the automobile exception and the open fields doctrine to reason that the hidden beeper in that case revealed nothing more to the police that what they constitutionally could have obtained through permissible visual surveillance.)

Relying upon the *Knotts,* a number of federal courts have held that the Government is not required to obtain a court order or a search warrant to install a hidden tracking device on the exterior of a motor vehicle. See *United States v. McIver,* 186 F.3d 1119, 1127 (9th Cir.1999) (placement of tracking device is neither a search nor seizure under Fourth Amend-

---

**15.** We do not address the question of whether the proof currently submitted by the United States is sufficient to sustain prosecution of the Defendants under count 13 of the superceding indictment for the knowing concealment of a tangible object in a federal investigation. The appropriate time for consideration of such motion is during trial at the close of the Government's case.

ment); *United States v. Moran,* 349 F.Supp.2d 425, 467 (N.D.N.Y.2005) (no Fourth Amendment violation occurred from installation of GPS device without a warrant because law enforcement officers could have conducted visual surveillance of the vehicle as it traveled on the public highways).

McIver and Moran both make good sense given the absence of a protected expectation of privacy that a vehicle operator would have in the exterior of his car. For example, Defendant Michael Ford's car was parked on a public street outside his home where it could be seen and approached by any passing stranger. Access to the exterior of the vehicle was not restricted in any fashion. The LMPD officers who placed the device did not trespass onto private property in order to magnetically attach the electronic tracking devices underneath the body of the car. Indeed, according to Sgt. Butler, the entire process of attaching the external bird dog took only a matter of seconds, during which time the interior of the vehicle was not entered or disturbed in any fashion.

Given the absence of a legitimate expectation of privacy that Defendant Michael Ford would have in the exterior of a publicly parked vehicle, and given the extremely minimal intrusion of the officers who magnetically attached the tracking devices to the vehicle, the Court is comfortable in concluding that no search warrant or other court order was required to permit the officers to lawfully attach the electronic tracking devices to the exterior of both Ford's and Kittrell's automobiles.

An entirely different conclusion might have resulted if, for example, the officers had unlawfully trespassed onto private property to attach the devices, or had otherwise monitored the devices while the vehicles were located on private property not otherwise accessible to the public. In *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), the U.S. Supreme Court relied on such a distinction to hold that the monitoring of a beeper device while it was located inside a private residence was a Fourth Amendment violation as the residents had a justifiable privacy interest once inside their home, as opposed to when traveling on the public streets in plain sight of all fellow travelers. *United States v. Jones,* 451 F.Supp.2d 71, 87–88 (D.D.C.2006) (distinguishing the circumstances of *Knotts* and *Karo*).

Such circumstances, however, are not present in the current case where officers merely used the externally attached tracking devices to maintain visual surveillance of the two vehicles while they traveled over the open highways to various public locations in Kentucky and Indiana. In the absence of any Sixth Circuit authority that would suggest that the mere attachment of an external tracking device to an automobile located on a public street violates a legitimate expectation of privacy of the vehicle owner/operator, the Court is bound to reject Defendant Michael Ford's initial argument challenging the warrantless placement of the tracking devices on the exterior of his automobile.

Defendant Ford's arguments to the contrary are not persuasive. Ford focuses on the similarity of purpose between the tracking device inserted on Defendant Kenneth L. Williams' automobile, which required the issuance of a search warrant so that police technicians could enter the passenger compartment of the vehicle to install the device, and the type of "bird dog" external tracking devices that officers attached to the exterior of his vehicle without a search warrant. Because the two types of tracking devices operate in similar fashion for the identical purpose of permitting police to maintain surveillance, Ford argues that no logical justification exists to

abrogate the warrant requirement before attaching external tracking devices.

Such reasoning overlooks the constitutional focus of the Fourth Amendment analysis. The Fourth Amendment focuses not upon the purpose of the devices, but rather upon the reasonable expectation of privacy accorded to the owner of the vehicle involved. Such an individual simply has no protected expectation that the exterior of his automobile, while located on a public area, will constitutionally be protected from even the most minor, momentary incidental contact. *See United States v. Coulombe,* 2007 WL 4192005 at *4 (N.D.N.Y. Nov. 26, 2007) ("There is no Fourth Amendment violation when the installation of a tracking device on a vehicle's undercarriage does not damage the vehicle or invade its interior, when the vehicle operator does not lose dominion or control, and when there is no other Fourth Amendment invasion during the installation.") (citing *McIver,* 186 F.3d at 1126–27). Accordingly, the Court must reject Defendant Ford's challenge to the constitutionality of the officers' actions in attaching the external, self-powered tracking devices to the undercarriage of his automobile. Defendant Ford had no reasonable expectation of privacy that the Constitution is willing to protect in the exterior of his automobile while it is parked on a public street.

**b. Automobile Exception.**

Both Defendant Michael Ford and Defendant Christopher Kittrell challenge the lawfulness of the warrantless stop of their automobiles. (DN 203, 215). The sole justification offered for the stop of Defendant Ford's automobile rests on the automobile exception to the warrant requirement. (DN 256). In contrast, Sgt. Butler and Redmon testified that the separate stop of Defendant Kittrell's automobile was justified not only by the automobile exception to the warrant requirements, but

also by various traffic violations observed by the officers immediately prior to the stop of Kittrell's vehicle. We begin with a discussion of the automobile exception to the warrant requirement.

■ The Constitution ordinarily requires a warrant to search or seize private property. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Graham,* 275 F.3d 490, 509 (6th Cir.2001), *cert. denied,* 535 U.S. 1026, 122 S.Ct. 1625, 152 L.Ed.2d 636 (2002) ("The preferable method for searching a person's private property is for the Government to obtain a warrant."). One exception to the warrant requirement, however, exists when law enforcement officers have probable cause to believe that a vehicle may contain evidence of a crime. *See Carroll v. United States,* 267 U.S. 132, 153–55, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Traditionally, the "automobile exception," rests on the ready mobility of automobiles and the fleeting opportunity of police to search them for evidence of crime where officers have probable cause to believe that such items will be found in the vehicle. *Chambers v. Maroney,* 399 U.S. 42, 50–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

■ An additional justification, the reduced privacy expectation of the occupants of a vehicle is discussed by the Supreme Court in *California v. Carney,* 471 U.S. 386, 391–92, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) as another basis on which to rest the automobile exception. Hence, no need for extraordinary or exigent circumstances exists to apply the automobile exception to the warrant requirement, so long as the vehicle involved is mobile and the searching officer has probable cause to believe that the fruits of crime may be found therein. *Maryland v. Dyson,* 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999).

The probable cause determination under this exception is in all respects identical to the probable cause analysis employed in search warrant analysis, with the exception that the strong preference that exists for upholding search warrants obviously does not apply in the context of the warrantless automobile exception. Otherwise, probable cause in this context is merely reasonable grounds for belief supported by less than *prima facie* proof but more than mere suspicion that evidence or fruits of criminal activity will be found in the vehicle involved at the time of the search. *United States v. Lumpkin,* 159 F.3d 983, 986 (6th Cir.1998); *Smith v. Thornburg,* 136 F.3d 1070, 1074 (6th Cir.1998).

■■■ Whether probable cause exists at the time of the search is to be determined in a commonsense, practical fashion based on an examination of the totality of the circumstances. *United States v. Smith,* 510 F.3d 641, 647 (6th Cir.2007) (citing *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990)). In determining whether such probable cause exists to justify the application of the automobile exception, the Court may not take into consideration events that occurred *after* the search, nor may it consider the subjective intent of the officers involved. *Smith,* 510 F.3d at 647. Instead, the Court looks to the objective facts as they were known to the officers at the time of the search. *Id.* All that is required is that such circumstances reveal a fair probability that contraband or evidence of a crime will be found in the particular vehicle involved. *United States v. Cope,* 312 F.3d 757, 775 (6th Cir.2002).

Probable cause may come from information provided by a confidential informant when such information is sufficiently detailed and corroborated by the independent investigation of law enforcement officers. *Lumpkin,* 159 F.3d at 986 (citing *Chambers v. Maroney,* 399 U.S. at 44, 90 S.Ct. 1975). *See United States v. Padro,* 52 F.3d 120, 123–24 (6th Cir.1995) (officer who had probable cause to believe that the defendant's car contained illegal narcotics based on the tip of an informant, which the officer corroborated, lawfully searched the vehicle without a warrant); *United States v. Brown,* 49 F.3d 1346, 1350 (8th Cir.1995) (police lawfully searched the defendant's truck without a warrant where the vehicle searched matched the information given by the informant and arrived at the location that was specified for the drug transaction). *See also United States v. Jordon,* 530 F.2d 722, 724 (6th Cir.1976) (probable cause may be based on hearsay information obtained from an informant even if such information alone would not support a finding of probable cause where independent investigation substantially verifies the informant's tip).

■■■ Police in this instance received significant, detailed information from informant Darrin Williams, a member of the alleged pickpocket ring, mere days prior to the Indianapolis trip. Williams accurately advised Sgt. Butler and the other officers involved in the investigation that Michael Ford and Christopher Kittrell would be traveling separately to Indianapolis on the 15th allegedly to steal ID and credit cards from sports fans attending the football game. Williams correctly provided the home addresses of the two men, as well as the make and model of the motor vehicles that they would be driving that day. He correctly related the date on which they would be traveling and their general time of departure that morning. Further, he explained in depth to the police the standard procedures used by the gang, such as parking their vehicles together, keeping the car keys under the floor mats, having one group leave the arena to use any stolen cards as soon as possible while the other group continued its efforts to steal more cards. He explained that the mem-

bers of the group would head toward bott-leneck points at busy intersections and outside the stadium ticket stands where crowds would accumulate to maximize their opportunity to steal wallets and purses without being discovered. (DN 252, T.H. pp. 100–101).

Sgt. Butler and the other officers who kept surveillance on Defendant Michael Ford's and Christopher Kittrell's vehicles repeatedly substantiated the accuracy of Darrin Williams' information. Just as predicted, Ford and Kittrell left from their respective homes on the morning of the 15th and separately drove to Indianapolis, where they parked next to each other several blocks away from the stadium. Officers watched the two groups from the vehicles link up and head into the crowd outside the stadium. Later, the same officers watched as one of the groups returned to its vehicle and drove off during the game, a circumstance that suggested that the group had successfully stolen wallets or purses and was rushing off to make use of the stolen credit cards before they were discovered to be missing.

Also, when the two groups began their trip back to Louisville from Indianapolis, officers watched as the occupants of Defendant Ford's automobile appeared to discover one of the hidden tracking devices underneath their car. After that point, both cars drove in an extremely cautious manner, contrary to how they drove to Indianapolis. The occupants of Ford's car looked about as if they were attempting to detect surveillance. Soon thereafter, when the two cars pulled off the interstate at a McDonald's restaurant 15 miles south of Indianapolis, one of the electronic tracking

devices on Ford's car went dead. Police later learned that the Defendants removed it and discarded it in a trash can at the restaurant.

Later that afternoon, when they saw marked LMPD police units waiting beside Interstate 65 just north of Louisville, the Defendants separated and immediately began to drive evasively. Accordingly, the significant details of Darrin Williams' tip were corroborated by the observations of the officers during their independent investigation on Jan. 15. Given this detailed, predictive information about the nature of the pickpocket ring and its modus operandi, along with the confirmation by independent observation, the Court concludes that probable cause existed to justify the warrantless stop of both Ford's and Kittrell's automobiles on their return to Louisville from Indianapolis. A common-sense examination of the totality of the circumstances raised a fair probability that evidence of pickpocketing would be found in the stopped vehicles.[16]

Based on the above circumstances, law enforcement officers reasonably concluded that a fair probability existed that evidence of crime, in particular pickpocketing, would be found in the vehicles of Michael Ford and Christopher Kittrell when they were stopped in the early evening of January 15, 2006, on their return from Indianapolis. Because both stops were justified by the automobile exception, the Court need not address whether an independent ground justified the stop of Kittrell's vehicle based upon his directly observed traffic safety violations, which included reckless driving, speeding and unsafe lane changes, according to the testimony of Det. Red-

---

**16.** Even if probable cause for the warrantless stop was not established, the circumstances clearly created a reasonable suspicion required for a *Terry* investigative stop of both vehicles under the constitutional case law discussed earlier at pages 23–25 of the report on the stop of Defendant Kenneth L. Williams'

automobile in December of 2005. Once the *Terry* stop was initiated, the officers likewise would be entitled to order the occupants from the vehicle and conduct pat down searches of them if the officers reasonably believed that their safety was at risk. *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir.2008).

mon. In view of the applicability of the automobile exception, the stop of Defendant Kittrell's automobile was lawful irrespective of the manner of his driving.

The final question is whether the officers lawfully searched the interior of the two automobiles, as well as their occupants following the warrantless stops. Sgt. Butler testified that upon the stop of Michael Ford's vehicle, all three of the occupants, including Michael, consented to a search of the automobile and of their persons. Michael Ford, who testified at the suppression hearing, however, denied that he consented to the search of his car.

The United States must establish by a preponderance of the evidence through clear and positive testimony that a valid consent to search was obtained from Ford. *United States v. Riascos–Suarez*, 73 F.3d 616, 625 (6th Cir.), *cert. denied*, 519 U.S. 848, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996). The question of whether a consent to search was given and was voluntary, is a question of fact to be determined from the totality of all the circumstances. *See, Schneckloth v. Bustamonte*, 412 U.S. 218, 227–28, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Coleman*, 458 F.3d 453, 458–59 (6th Cir.2006).

Some factors that the Court may examine to determine whether a consent to search is valid include the age, intelligence and education of the Defendant; whether the Defendant understands his right to refuse consent; whether the Defendant understands his or her constitutional rights; the length and nature of any detention preceding the challenged consent; and the alleged use of any coercive conduct by the police. *See, United States v. Jones,*

846 F.2d 358, 360 (6th Cir.1988) (citing *Schneckloth* ). To be voluntary, consent must be "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v. Scott,* 578 F.2d 1186, 1188–89 (6th Cir.1978). Consent to search "may be in the form of words, gesture or conduct." *United States v. Carter,* 378 F.3d 584, 587 (6th Cir.2004), *cert. denied,* 543 U.S. 1155, 125 S.Ct. 1298, 161 L.Ed.2d 121 (2005) (citing *United States v. Griffin,* 530 F.2d 739, 742 (7th Cir.1976)). The Court looks to the record to determine if the United States has carried its burden.

Unfortunately, the record contains little in the way of factual detail about the alleged consent to search given by Michael Ford and the other occupants of his automobile. Only Sgt. Butler testified on this point for the United States, and his testimony was conclusory at best. Without significantly more facts, the Court cannot meaningfully determine whether Defendant Ford voluntarily and intelligently consented to the search of his vehicle. All that the Court has before it in this regard is a "he said/he said" situation with Butler maintaining that the consent to search the automobile occurred and Ford denying that he consented to the car search. Because the burden rests with the Government to establish the existence and voluntariness of the consent, as being unequivocal, specific and intelligently given, the present record is inadequate to satisfy this burden. Thus, if the evidence taken from Michael Ford's person and automobile is to be admitted, its seizure must rest upon some other ground than Ford's alleged consent.[17]

17. The same problem does not arise with respect to the consent of Defendants Frederick Malone and Keith Ford to the search of their persons at the time that Michael Ford's automobile was stopped that evening. Neither Malone nor Keith Ford have any pending motion to suppress the evidence, if any, seized from their persons at the time of the vehicle stop. Although Ford moved to join in the motion to suppress filed by his brother Michael (DN 211), the district court entered an order that denied this motion based on a lack of standing (DN 244). Accordingly, any evi-

■ While the United States cannot justify its warrantless search of Defendant Michael Ford's person or his automobile based on consent, given Ford's denial of consent to search, a separate, independent ground does exist to justify the search of Michael Ford's automobile. Once again, the automobile exception comes into play. Not only may the police lawfully stop a vehicle that they have probable cause to believe contains evidence of criminal activity, the same officers also may search the interior of the vehicle without a warrant, as well. *United States v. Lumpkin,* 159 F.3d at 986. As the Supreme Court explained in *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996), "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits the police to search the vehicle without more."

■ Once the officers involved find such contraband or evidence of criminal conduct in the passenger compartment of the automobile, they may properly conclude that a fair probability exists that further contraband or evidence of crime will be found in the trunk. *United States v. Riedesel,* 987 F.2d 1383, 1389 (8th Cir. 1993) (a warrantless search of the trunk of an automobile stopped pursuant to the automobile exception is lawful so long as the officers had probable cause to believe that the trunk contained contraband or other evidence of a crime before they began the search of it). *Roberts v. United States,* 399 F.Supp.2d 650, 654 (D.Md.2005). Because probable cause existed to stop and search both Ford's and Kittrell's automobiles, the police were lawfully permitted to search the interiors of both cars, irrespective of the alleged absence of consent by Defendant Ford or the insufficient nature

of the government's proof of consent to search.

■ The only remaining question for Michael Ford is whether an independent constitutional basis exits to justify the warrantless search of his person following the stop. Consent to search, as noted, was not established by the United States given the insufficient nature of its proof on this issue, particularly in light of Michael Ford's testimony that he did not consent. Further the automobile exception, while it may justify a search of the car's interior and the personal possessions of its occupants found therein, *Wyoming v. Houghton,* 526 U.S. 295, 303, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), it will not alone justify the warrantless search of the vehicle's occupants themselves. *Houghton,* 526 U.S. at 303 n. 1, 119 S.Ct. 1297 (citing *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948)). *See also Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). Nor will the search incident to arrest exception justify the warrantless search of Michael Ford's person as Ford was not placed under arrest following the stop, but was permitted to go, and no government witness testified that probable cause then existed to arrest Michael Ford specifically, as opposed to probable cause to believe that both vehicles would contain evidence of stolen credit and identification cards. For these reasons, any items seized directly from the person of Michael Ford should be suppressed from evidence, in all other respects his motion to suppress should be denied.

The Court reaches a different conclusion as to any items seized from the person of Defendant Kittrell, or any post-arrest statements he may have made, if any.

dence seized from either of these two defendants is not subject to suppression, there be-

ing no pending motion to suppress filed by either defendant.

Kittrell was taken into custody immediately following the stop of his vehicle and was arrested based on various traffic offenses witnessed by the police as they followed him that evening. He therefor was subject to the search incident to arrest doctrine as recently redefined in *Arizona v. Gant,* —— U.S. ——, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). The interior of his vehicle was separately subject to search under the automobile exception discussed above. For these reasons his motion to suppress should be denied in its entirety

### RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusions of law recommends that the motion of Defendant Kenneth L. Williams to suppress those items seized from his home at 9938 Apollo Court and the gold Suburban automobile located thereat should be **GRANTED.** Defendant Kenneth L. Williams' remaining suppression motions should be **DENIED,** with the exception of his request to suppress from evidence the rental storage receipt taken from his automobile and copied by LMPD officers on December 21, 2005, which should be **GRANTED.** The suppression motion of Defendant Michael Ford should be **DENIED,** except to the extent of those items seized from his person at the time his vehicle was stopped on January 15, 2006. The motion of Christopher Kittrell to suppress should be **DENIED** in all respects for the reasons set forth above.